THE STATE OF OHIO, APPELLEE, *v.* DIXON, APPELLANT.

[Cite as *State v. Dixon,* 101 Ohio St.3d 328, 2004-Ohio-1585.]

(No. 2001–0013—Submitted October 21, 2003—Decided April 14, 2004.)

PFEIFER, J.

{¶ 1} Archie J. Dixon, defendant-appellant, and Christopher Hammer were friends and former housemates. On September 22, 1993, Dixon and a co-defendant, Timothy Hoffner, beat Hammer, tied him to a bed, and stole the contents of his wallet and his automobile. Dixon and Hoffner then drove Hammer to a remote area, buried him alive in a shallow grave, and left him to die. Dixon was convicted of the aggravated murder, aggravated robbery, and kidnapping of Hammer, and was sentenced to death.

{¶ 2} Hammer began his friendship with Dixon and Hoffner in the summer of 1993. For a short period of time in mid-August 1993, Dixon, Hoffner, and Hammer stayed at the Toledo home of Kirsten Wilkerson, Dixon's girlfriend.

{¶ 3} In early September 1993, Dixon, Hoffner, and Michael Elting borrowed Hammer's car, a 1987 Dodge Daytona, to go to the movies. According to Elting, Dixon and Hoffner discussed what they could do with Hammer's car and where they could store it.

{¶ 4} On the afternoon of September 21, 1993, Dixon told Wilkerson that he and Hoffner were going to "get Chris tonight." Wilkerson understood this to mean that Dixon and Hoffner were going to kill Hammer. Later that evening, Dixon, Hoffner, and Hammer met at a Toledo pool hall.

{¶ 5} In the early morning of September 22, Dixon, Hoffner, and Hammer arrived at Wilkerson's house. Once there, Dixon and Hoffner attacked Hammer and severely beat him. Hoffner tried to break Hammer's neck, and Dixon struck Hammer in the head with a wine bottle. Hammer, in substantial pain and bleeding, begged his attackers to stop. Dixon and Hoffner then tied Hammer to a bunk bed ladder, and Dixon went through Hammer's wallet, taking $11 in cash, Hammer's birth certificate, and his Social Security card. At one point, Dixon and Hoffner discussed how they could dispose of Hammer's body.

{¶ 6} Dixon and Hoffner left Wilkerson's house to dig a grave, while Hammer remained tied to the ladder. After Dixon and Hoffner returned, they, along with Wilkerson, drove Hammer to the grave site in Hammer's car. Wilkerson stayed

at the car while Dixon and Hoffner walked Hammer into the woods, where they smoked a cigarette and said a prayer. Then they gagged and blindfolded Hammer, tied his hands and feet behind his back, and pushed him into the grave, still alive. Dixon and Hoffner held Hammer down while they covered him with dirt. After Hammer was completely buried, Dixon and Hoffner walked back and forth across the grave, packing down the dirt.

{¶ 7} On September 25, 1993, as part of a plan to sell Hammer's car, Dixon obtained a state of Ohio identification ("ID") card with his photograph but in Hammer's name. On September 30, Dixon obtained a duplicate certificate of title for Hammer's Dodge Daytona. Dixon then sold Hammer's car to a Toledo car dealer for $2,800.

{¶ 8} On November 1, 1993, an Ottawa Hills police officer stopped Dixon for vehicle equipment violations while he was driving Hoffner's Chrysler Cordoba. When the officer discovered that Dixon did not have driving privileges, the officer impounded the car. During an inventory of the car, police found the ID card with Dixon's picture but Hammer's name, address, birth date, and Social Security number.

{¶ 9} By November 8, 1993, police officers investigating Hammer's disappearance had located his Dodge Daytona at a used car lot in Toledo, had confirmed its unauthorized sale on September 30, and had identified Dixon as the prime suspect in the vehicle transaction. On November 9, Dixon was arrested and charged with forgery. Police, who did not advise Dixon of his *Miranda* rights, questioned him regarding the sale of Hammer's car. However, the primary interest of the police was not the sale of the car but Hammer's disappearance. During this interview, Dixon confessed to the auto title forgery but denied all knowledge of Hammer's disappearance.

{¶ 10} Early on the afternoon of November 9, Hoffner led police to the location of Hammer's body. Dr. Cynthia Beisser, Deputy Coroner of Lucas County, performed the autopsy and concluded that Hammer had died of asphyxia. Dr. Beisser opined that Hammer had died within eight minutes of being buried and remained conscious during the first two to three minutes.

{¶ 11} After Hammer's body was exhumed, police interviewed Dixon again. Police twice advised Dixon of his *Miranda* rights. He signed a waiver-of-rights form and provided a tape-recorded account of the kidnapping, robbery, and murder of Hammer that reflects the facts already described.

{¶ 12} The defense presented no evidence during the trial phase.

{¶ 13} The grand jury indicted Dixon, Hoffner, and Wilkerson for the aggravated murder, kidnapping, and aggravated robbery of Hammer. Dixon was indicted on three counts of aggravated murder. Count nine of the indictment

charged Dixon with aggravated murder involving prior calculation and design pursuant to R.C. 2903.01(A). Count ten charged Dixon with aggravated murder while committing kidnapping, and count 11 charged Dixon with aggravated murder while committing aggravated robbery, both pursuant to R.C. 2903.01(B). Dixon was also indicted for kidnapping in count twelve, aggravated robbery in count 13, and three counts of forgery in counts 14, 15, and 16.

{¶ 14} Each count of aggravated murder contained two identical R.C. 2929.04(A)(7) death-penalty specifications. The first specification charged aggravated murder during a kidnapping, and the second charged aggravated murder during an aggravated robbery.

{¶ 15} The jury convicted Dixon as charged and recommended the death penalty. The trial court sentenced Dixon to death for the murder, ten to 25 years in prison for each kidnapping and aggravated robbery conviction, and to 18 months in prison for each forgery offense. All prison terms were consecutive. The court of appeals affirmed Dixon's convictions and sentence of death. The cause is now before this court upon an appeal as of right.

## *Miranda* Issue

{¶ 16} In proposition of law No. 1, Dixon challenges the court of appeals' decision to reverse the trial court's suppression of his murder confession. The trial court had suppressed Dixon's statements admitting to the auto title forgery and to Hammer's murder. The state filed an appeal, pursuant to R.C. 2945.67 and Crim.R. 12(J), challenging only the suppression of Dixon's murder confession. The court of appeals reversed the trial court's decision, and the trial proceeded with the confession in evidence. *State v. Dixon* (1995), 101 Ohio App.3d 552, 656 N.E.2d 1.

{¶ 17} Dixon contends that his confession was inadmissible because the police decision not to administer *Miranda* warnings undermined his ability to exercise his will to refuse to speak, depriving him of his Fifth Amendment right against self-incrimination.

{¶ 18} During the investigation into Hammer's disappearance, the police questioned Dixon on four separate occasions, three of which are relevant here. On November 4, 1993, Dixon went to the Sylvania Township Police Department to obtain the release of the impounded Chrysler. Coincidentally, Toledo Detective Ron Scanlon was then meeting with Sylvania Detective Vern Snow regarding Hammer's disappearance. Scanlon had information that Dixon and Hammer had once lived together, and he and Snow attempted to question Dixon ("session I"). Although Dixon was not under arrest or in custody, Scanlon issued *Miranda* warnings. When Dixon said that he wanted to speak with his attorney, the detectives stopped questioning him, and Dixon left the station.

{¶ 19} On November 9, 1993, Dixon was arrested for forgery, and Snow and Detective Phil Kulakoski questioned Dixon at the Toledo Police Department ("session II"). Kulakoski, after consulting with Snow, decided not to advise Dixon of his *Miranda* rights because the detectives believed that Dixon would invoke his right to counsel if he were issued *Miranda* warnings.

{¶ 20} The detectives questioned Dixon from approximately 11:30 a.m. to 3:30 p.m. Because of several breaks during questioning, the entire interview lasted only about 45 minutes. The police were focused primarily on Hammer's disappearance, but Dixon made incriminating statements regarding only the forgery charge. He denied all knowledge of Hammer's disappearance during the session II interview. In response to Kulakoski's assertion that something had happened to Hammer, Dixon stated:

{¶ 21} "[T]hat is understandable, but everything I know I've already told you. I have been more than welcome to tell you. I mean usually like I told you, you can ask that gentleman [Detective Snow] right here * * * I didn't even want to speak with you guys unless I had an attorney present, because * * * I have no faith in the system anymore, but yet like I say I just now told you, I told you everything I know[, I] admitted to forgery * * *."

{¶ 22} At the end of the interview, Dixon was returned to the county jail. Shortly thereafter, Kulakoski learned that Hammer's body had been discovered. As a result, Kulakoski and Detective Robert Leiter decided to question Dixon again. At approximately 7:30 p.m., Kulakoski and Leiter transported Dixon to the station. Prior to any questioning from police, Dixon volunteered that he had heard that police had found a body and asked whether Hoffner was in custody. After police told Dixon that Hoffner was not in custody, Dixon said, "I talked to my attorney, and I want to tell you what happened." Police then twice advised Dixon of his *Miranda* rights, and the second warning was tape-recorded. Dixon waived his *Miranda* rights, signed a waiver-of-rights form, and gave a statement implicating himself and Hoffner in Hammer's death ("session III").

{¶ 23} The parties do not dispute that the statements Dixon made in session II were properly suppressed. At issue here are Dixon's statements in session III, after police had found Hammer's body, and after Dixon was twice fully advised of his *Miranda* rights.

{¶ 24} The United States Supreme Court's decision in *Oregon v. Elstad* (1985), 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222, is the leading case on this issue. *Elstad* held that if a suspect's statement obtained in violation of *Miranda* is nevertheless voluntary, the Fifth Amendment does not require the suppression of a subsequent confession made after a suspect has been fully advised of and has properly waived *Miranda* rights. Id. at 318, 105 S.Ct. 1285, 84 L.Ed.2d 222. The *Elstad* court rejected the contention that the suspect's confession must be

excluded as "fruit of the poisonous tree" because it had been tainted by the earlier failure of the police to provide *Miranda* warnings. Id. at 305–307, 105 S.Ct. 1285, 84 L.Ed.2d 222, quoting *Wong Sun v. United States* (1963), 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441. The court reasoned that there was no need to presume a coercive effect on a later confession when the suspect's first statement, though technically obtained in violation of *Miranda*, had been voluntary. Id. at 318, 105 S.Ct. 1285, 84 L.Ed.2d 222.

{¶ 25} *Elstad* requires courts to make a threshold inquiry into the effect of the violation on the voluntariness of the suspect's unwarned statement. See id. at 312 and at 317–318, 105 S.Ct. 1285, 84 L.Ed.2d 222. "Whether a statement was made voluntarily and whether an accused voluntarily, knowingly, and intelligently waived his right to counsel and right against self-incrimination are distinct issues. However, both are measured by the 'totality of circumstances' standard" (e.g., the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement). *State v. Eley* (1996), 77 Ohio St.3d 174, 178, 672 N.E.2d 640. See, also, *State v. Clark* (1988), 38 Ohio St.3d 252, 261, 527 N.E.2d 844; *State v. Moore* (1998), 81 Ohio St.3d 22, 31, 689 N.E.2d 1. See, also, *State v. Edwards* (1976), 49 Ohio St.2d 31, 3 O.O.3d 18, 358 N.E.2d 1051, paragraph two of the syllabus. While the state carries the burden of proving voluntariness by a preponderance of the evidence, "evidence of police coercion or overreaching is necessary for a finding of involuntariness * * *." *State v. Hill* (1992), 64 Ohio St.3d 313, 318, 595 N.E.2d 884, citing *Colorado v. Connelly* (1986), 479 U.S. 157, 164, 107 S.Ct. 515, 93 L.Ed.2d 473.

{¶ 26} There is no evidence of coercive tactics that would have rendered Dixon's unwarned statements in session II involuntary. The detectives did not threaten Dixon in any way, nor was there physical or verbal abuse. Dixon was given several breaks during the interview, was given something to drink, was offered food, and was permitted to go to the bathroom. See *State v. Cooey* (1989), 46 Ohio St.3d 20, 28, 544 N.E.2d 895; *Clark*, 38 Ohio St.3d at 261, 527 N.E.2d 844. Moreover, there is no evidence that the detectives' strategy not to *Mirandize* Dixon had the effect of undermining Dixon's will to refuse to speak with them. Dixon has failed to explain how the detectives' subjective intent coerced him to a greater extent than if the *Miranda* violation had been inadvertent.

{¶ 27} Police also did not make any promises to Dixon that affected the voluntariness or admissibility of his confession. Admittedly, near the end of the interview in session II, Kulakoski told Dixon that if he had been involved in Hammer's disappearance, "now is the time to say so because if Tim [Hoffner]

cuts a deal * * * it's kinda like a bus leaving. The first one that gets on is the only one that gets on."

{¶ 28} The trial court placed significance on Kulakoski's "bus analogy," finding that his statement could be perceived as a promise of possible benefits if Dixon revealed information regarding Hammer's disappearance. However, a promise made by a police officer is merely one factor to be considered along with other circumstances in determining whether a defendant's statement was voluntary. *Edwards,* 49 Ohio St.2d at 40–41, 3 O.O.3d 18, 358 N.E.2d 1051. It does not matter that the accused confessed in response to the promise so long as the promise did not overwhelm his will. See, e.g., *State v. Burke* (1995), 73 Ohio St.3d 399, 406, 653 N.E.2d 242, citing *State v. Melchior* (1978), 56 Ohio St.2d 15, 25, 10 O.O.3d 8, 381 N.E.2d 195.

{¶ 29} In addition, Kulakoski's bus analogy is more akin to an admonition to tell the truth than a promise of possible benefits. Police use of such tactics is not improper. See *Cooey,* 46 Ohio St.3d at 28–29, 544 N.E.2d 895; and *Edwards,* 49 Ohio St.2d at 39–41, 3 O.O.3d 18, 358 N.E.2d 1051. See, also, *Illinois v. Perkins* (1990), 496 U.S. 292, 297, 110 S.Ct. 2394, 110 L.Ed.2d 243 ("Ploys to mislead a suspect or lull him into a false sense of security that do not rise to the level of compulsion or coercion to speak are not within *Miranda's* concerns").

{¶ 30} Any effect that the bus analogy had on Dixon's murder confession is purely speculative. Dixon did not testify at the suppression hearing, and Dixon denied all knowledge of Hammer's disappearance during session II, when the bus analogy was made. Moreover, any argument that Dixon's will was undermined at any point during session II on November 9 is suspect in light of Dixon's prior invocation of his Fifth Amendment rights. Dixon also indicated his awareness of his rights during session II. Further, at the outset of session III, Dixon stated that he had spoken with his attorney and indicated that he had been told to cooperate with police. Finally, Dixon's own words belie the assertion that any statements made during session II were involuntary: "[E]verything I know I've already told you [Detectives Kulakoski and Snow]. I have been more than welcome to tell you."

{¶ 31} Additionally, because Dixon denied all knowledge of Hammer's disappearance during session II, no nexus was established between Dixon's unwarned statements in session II and his confession in session III. Thus, Dixon's confession in session III was not the "fruit" of the session II interview. Dixon's statements from session II, although unwarned, were voluntary, and they did not affect the voluntariness of his session III confession or impair his ability to give a valid waiver.

{¶ 32} Once a court determines that a suspect's unwarned statement was voluntary, the focus of the inquiry shifts to whether the suspect's subsequent

statement was knowingly and voluntarily made.  *Elstad,* 470 U.S. at 309 and at 317–318, 105 S.Ct. 1285, 84 L.Ed.2d 222.   Here, Dixon's warned confession in session III was voluntary.   Police twice read *Miranda* warnings to Dixon, and both times he waived his rights.   Dixon also signed a waiver-of-rights form. Dixon's waiver of rights and his entire confession were recorded.   Dixon acknowledged that he understood his rights and that he was making his statement of his own free will.   He assented that he was not under the influence of drugs or alcohol and that no deals or promises had been made in exchange for his confession.   The entire interview lasted approximately half an hour, there was no evidence of mistreatment, and Dixon remained calm and collected throughout.

{¶ 33} In addition, four hours had lapsed between session II and session III. At the outset of session III, Dixon initiated the conversation when the detectives came to question him by asking about the discovery of Hammer's body and Hoffner's whereabouts.   He also indicated his willingness to talk about Hammer's disappearance.   Dixon was 20 years old at the time of his confession and was familiar with the criminal justice system and his rights thereunder.   Therefore, based on the totality of the circumstances, we conclude that Dixon knowingly and voluntarily waived his right to remain silent and to consult with counsel on the occasion of his session III interview on November 9.

{¶ 34} Admittedly, session II, in contrast to the circumstances in *Elstad,* involves an intentional *Miranda* violation.   Nevertheless, as in *Elstad,* the breach of the *Miranda* procedures here involved no actual compulsion.   Thus, suppression of Dixon's confession, made after he had executed an intelligent and voluntary waiver of rights, will not advance the general goal of deterring improper police conduct or the Fifth Amendment goal of assuring trustworthy evidence.   See *Elstad,* 470 U.S. at 318, 105 S.Ct. 1285, 84 L.Ed.2d 222 ("[T]he dictates of *Miranda* and the goals of the Fifth Amendment proscription against use of compelled testimony are fully satisfied" in this case by "barring use of the unwarned statement" and "[n]o further purpose is served by imputing 'taint' to subsequent statements obtained pursuant to a voluntary and knowing waiver").

{¶ 35} For the foregoing reasons, we reject Dixon's first proposition of law.

### *Trial–Phase Issues*

{¶ 36} In proposition of law No. 5, Dixon contends that the trial court's failure to inquire on the record whether he knowingly and intelligently waived his right to testify violated his right to due process.   We rejected this same argument in *State v. Bey* (1999), 85 Ohio St.3d 487, 499–500, 709 N.E.2d 484.   Proposition of law No. 5 is summarily rejected.

{¶ 37} Dixon contends in proposition of law No. 6 that the trial court erred because it instructed the jury that it could assume Dixon's guilt and that the

assumption would require the jury to return a guilty verdict. Defense counsel did not object to the alleged instruction and, therefore, waived all but plain error. Crim.R. 30(A); Crim.R. 52(B); *State v. Underwood* (1983), 3 Ohio St.3d 12, 3 OBR 360, 444 N.E.2d 1332, syllabus. There was no plain error.

{¶ 38} The trial court did not instruct the jury that it could assume Dixon's guilt. During one portion of its trial-phase instructions, the trial court charged the jury:

{¶ 39} "Thus, assuming a finding of the defendant is guilty beyond a reasonable doubt of the aggravated murder with prior calculation and design of Christopher Hammer as charged in Count [9] of the indictment, and further assuming a finding as to Specification 1 that the aggravated murder of Christopher Hammer was committed during the course of a kidnapping, and further finding beyond a reasonable doubt that the defendant, Archie J. Dixon, was either a principal offender in that murder or that the aggravated murder was committed with prior calculation and design, will mandate a finding of guilty as to Specification 1."

{¶ 40} Despite an unfortunate choice of words, it is clear that the trial court did not instruct the jury that it must assume Dixon's guilt. Rather, the trial court instructed the jury that *if* it found beyond a reasonable doubt the facts alleged in the charge and specification one in count nine, the jury was required to return a guilty verdict as to that charge and specification.

{¶ 41} Moreover, a single jury instruction "may not be judged in artificial isolation but must be viewed in the context of the overall charge." *State v. Price* (1979), 60 Ohio St.2d 136, 14 O.O.3d 379, 398 N.E.2d 772, paragraph four of the syllabus. Our review of the trial-phase instructions in their entirety indicates that the jury was properly charged on the presumption of innocence, reasonable doubt, and the burden of proof.

{¶ 42} We overrule proposition of law No. 6.

### Ineffective Assistance of Counsel

{¶ 43} In proposition of law No. 2, Dixon alleges various instances of ineffective assistance of counsel. Reversal of a conviction or sentence based upon ineffective assistance of counsel requires satisfying the two-pronged test set forth in *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. *Strickland* requires that the defendant first show that counsel's performance was deficient and, second, that counsel's deficient performance prejudiced the defense so as to deprive defendant of a fair trial. Id. at 693, 104 S.Ct. 2052, 80 L.Ed.2d 674.

{¶ 44} Dixon contends that trial counsel were deficient during voir dire when they failed to meaningfully examine jurors' views on capital punishment. This claim lacks merit.

{¶ 45} "The conduct of voir dire by defense counsel does not have to take a particular form, nor do specific questions have to be asked." *State v. Evans* (1992), 63 Ohio St.3d 231, 247, 586 N.E.2d 1042. Moreover, not questioning certain members of the venire or asking too few questions of prospective jurors falls within the wide range of reasonable professional assistance. *State v. Bradley* (1989), 42 Ohio St.3d 136, 143–144, 538 N.E.2d 373, citing *Strickland,* supra.

{¶ 46} During voir dire, the trial court and counsel questioned prospective jurors individually about their views on capital punishment. The trial court asked prospective jurors whether they were "morally, religiously, philosophically, or otherwise opposed to the death penalty"; whether, if appropriate, they could vote for the death penalty; and, whether they would fairly consider the two other sentencing options of life imprisonment with parole eligibility after 20 or 30 years. The trial court also asked prospective jurors whether they would automatically vote to impose the death penalty regardless of the facts of the case.

{¶ 47} Both state and defense counsel were then permitted to question prospective jurors as to their views on capital punishment. In most instances, defense counsel merely asked whether prospective jurors would follow the law and the judge's instructions and whether they would consider other penalty options besides death.

{¶ 48} Defense counsel's performance in this regard was not deficient. See *Bradley,* 42 Ohio St.3d at 143–144, 538 N.E.2d 373. See, also, *State v. Watson* (1991), 61 Ohio St.3d 1, 13, 572 N.E.2d 97 (counsel need not repeat questions about topics already covered by group voir dire, the trial judge, or the prosecutor). The record demonstrates appropriate questioning. Whenever a prospective juror indicated a possible pro-death-penalty bias, the court and defense counsel inquired further into his or her beliefs.

{¶ 49} Dixon also contends that defense counsel failed to ensure that the prospective jurors could fairly consider life. See *Morgan v. Illinois* (1992), 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492. To show prejudice under the *Strickland* standard, Dixon would have to show that the jurors who actually decided the case were not impartial. See *State v. Broom* (1988), 40 Ohio St.3d 277, 287–288, 533 N.E.2d 682.

{¶ 50} We find that the record does not support Dixon's claim. Defense counsel questioned nearly every prospective juror about whether he or she would fairly consider a life sentence if warranted. The only prospective jurors that defense counsel did not question on this issue were those who expressed reservations or outright opposition to the death penalty. Thus, Dixon has not shown counsel's performance to be deficient.

{¶ 51} Dixon next contends that defense counsel admitted guilt at the outset of the trial "with a seventeen sentence opening statement." Defense counsel did not concede Dixon's guilt. In fact, defense counsel informed the jury that Dixon was innocent until proven guilty and that the burden was on the prosecution to prove guilt. Moreover, the defense reminded the jury of the court's and counsel's previous statements regarding reasonable doubt made during both individual voir dire and prior to the exercise of peremptory challenges.

{¶ 52} Courts must be highly deferential to counsel's performance and will not second-guess trial strategy decisions. *State v. Tibbetts* (2001), 92 Ohio St.3d 146, 166, 749 N.E.2d 226. While admittedly brief, defense counsel's opening statement did not fall below a reasonable standard of professional assistance. See *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052, 80 L.Ed.2d 674.

{¶ 53} Dixon also argues that defense counsel were ineffective by cross-examining only three of the 15 state witnesses and failing to impeach or cast doubt upon their testimony. The defense challenged the state's portrayal of Hammer as a totally innocent young man of exemplary character. In an attempt to diffuse juror sympathy, defense counsel cross-examined Jennifer Wodarski–Felt, the victim's former girlfriend, and Barbara Hammer, the victim's mother, regarding Christopher Hammer's alleged involvement with drugs and misuse of a credit card. The defense also questioned Detective Kulakoski regarding the discovery of Hammer's body near the Michigan border, a state without the death penalty, in an apparent attempt to suggest the arbitrariness of the death penalty to the jury. In addition, defense counsel attempted to introduce testimony regarding Hammer's alleged conviction of felony auto theft.

{¶ 54} Counsel's tactical decisions reflected reasonable representation. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052, 80 L.Ed.2d 674. The extent and scope of cross-examination clearly fall within the ambit of trial strategy, and debatable trial tactics do not constitute lack of effective assistance of counsel. See *Bradley*, 42 Ohio St.3d at 142–144, 538 N.E.2d 373.

{¶ 55} The testimony of other state witnesses consisted primarily of eyewitness accounts and conversations regarding Dixon's involvement in Hammer's murder, stealing and selling the victim's car, obtaining a fake ID and duplicate automobile title, and his confession. Experienced counsel would realize that any attempt to cross-examine these witnesses would have merely reemphasized their damaging testimony. Moreover, Dixon has not shown how defense counsel could have cross-examined the state's witnesses so as to alter the outcome of the trial. Defense counsel were not ineffective for avoiding such cross-examination.

{¶ 56} Dixon further contends that his counsel failed to impeach the state's most critical witness, Kirsten Wilkerson. Wilkerson, Dixon's former girlfriend, gave a firsthand account of Hammer's murder. Dixon claims that Wilkerson's version of the facts was suspect because she had made three different statements to the police. However, nothing in the record shows that Wilkerson provided the police with inconsistent statements, nor does Dixon indicate what discrepancies exist. Nevertheless, even if defense counsel were deficient in failing to impeach Wilkerson, we find no prejudicial error in view of the overwhelming evidence of guilt.

{¶ 57} Finally, Dixon argues that defense counsel's trial-phase closing argument was a failure. During closing argument, defense counsel indicated that their primary strategy was to prevent Dixon's death. Defense counsel reminded the jury of the state's burden to prove every element of the offenses charged beyond a reasonable doubt and asked jurors to follow the judge's instructions and apply the law conscientiously. Moreover, defense counsel cautioned the jury to carefully examine the testimony of Dixon's alleged accomplice, Wilkerson. Defense counsel's performance during closing argument represented a permissible tactical decision. See *State v. Ballew* (1996), 76 Ohio St.3d 244, 256–257, 667 N.E.2d 369.

{¶ 58} Dixon has provided no basis for concluding that defense counsel's performance fell below an objective standard of reasonable representation or that any different tactical choices would have made any difference in the jury's verdict in view of the strong evidence of guilt, including his confession to the murder. *Bradley,* 42 Ohio St.3d 136, 538 N.E.2d 373. Therefore, we reject Dixon's second proposition of law.

{¶ 59} In proposition of law No. 4, Dixon claims that he was denied the effective assistance of counsel during his mitigation hearing when his trial counsel failed to investigate or present other available mitigation evidence.

{¶ 60} In *Wiggins v. Smith* (2003), 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471, the United States Supreme Court held that the failure to conduct a reasonable investigation into defendant's history and background and present mitigating evidence constituted ineffective assistance of counsel. See, also, *Williams v. Taylor* (2000), 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389. The Supreme Court found in *Wiggins* that defense counsel's decision to limit its investigation into potential mitigating evidence in pursuing an alternative strategy was unreasonable under prevailing professional norms. *Wiggins,* 539 U.S. at ——, 123 S.Ct. at 2536–2537, 156 L.Ed.2d 471.

{¶ 61} In order to determine whether trial counsel's performance during mitigation prejudiced Dixon's defense within the meaning of *Strickland,* we would have to reweigh the evidence in aggravation against the totality of *available*

mitigating evidence. *Wiggins*, 539 U.S. ——, 123 S.Ct. at 2542–2543, 156 L.Ed.2d 471, citing *Williams*, 529 U.S. at 397–398, 120 S.Ct. 1495, 146 L.Ed.2d 389.

{¶ 62} Here, there is no way to determine, based on the record before us, whether sufficient mitigating evidence existed that would have called for a sentence less than death. Because we cannot look outside the record to assess prejudice, this ineffective-assistance claim must fail. See *State v. Ishmail* (1978), 54 Ohio St.2d 402, 8 O.O.3d 405, 377 N.E.2d 500, paragraph one of the syllabus. See, also, *State v. Madrigal* (2000), 87 Ohio St.3d 378, 390–391, 721 N.E.2d 52. Therefore, we also reject proposition of law No. 4.

{¶ 63} Dixon argues in proposition of law No. 10 that trial counsel's failure to preserve errors identified in his brief deprived him of the effective assistance of counsel. Dixon further contends that the cumulative effect of counsel's errors deprived him of a fair trial.

{¶ 64} We conclude that Dixon has failed to satisfy the test outlined in *Strickland*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. Dixon has pointed to only two instances where defense counsel failed to object to alleged errors committed by the trial court. See Dixon's propositions of law No. 5 and No. 6. We have examined both of these claims and have found them meritless. Dixon has not identified any other instance where he was prejudiced by counsel's failure to preserve issues for appeal.

{¶ 65} Furthermore, counsel's errors are judged under the *Strickland* standard. We reject Dixon's contention that the number of errors committed by counsel deprived him of his right to a fair trial. See, generally, *State v. DeMarco* (1987), 31 Ohio St.3d 191, 31 OBR 390, 509 N.E.2d 1256, paragraph two of the syllabus. Thus, we reject Dixon's proposition of law No. 10.

### Sentencing–Phase Issues

{¶ 66} In proposition of law No. 3, Dixon contends that the trial court erred when it excluded certain evidence during the mitigation phase. Before the start of mitigation, Dixon's counsel informed the court that they intended to introduce evidence of two other capital murders in Lucas County where the prosecutor eliminated the death specifications in exchange for guilty pleas to aggravated murder. Trial counsel additionally wanted to introduce evidence that Dixon accepted complete responsibility for the crimes by offering to plead guilty to the charges in exchange for dismissal of the death-penalty specifications. Defense counsel also proffered evidence regarding Dixon's prior incarceration on a rape charge based on a false allegation, which was subsequently dismissed.

{¶ 67} The applicable statute, R.C. 2929.04(C), gives a defendant wide latitude to introduce any evidence the defendant considers mitigating. See R.C.

2929.04(B)(7); *State v. Steffen* (1987), 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383, paragraph two of the syllabus. Nonetheless, the trial court can exclude evidence that is not relevant to the jury's sentencing decision. The question of relevancy is governed by the Rules of Evidence, and those rules apply to the sentencing phase of a capital trial. *State v. Williams* (1995), 73 Ohio St.3d 153, 159, 652 N.E.2d 721. See, also, *State v. Jenkins* (1984), 15 Ohio St.3d 164, 189–190, 15 OBR 311, 473 N.E.2d 264 (testimony of a former death-row inmate, a social scientist, and a specialist in the rehabilitation of paraplegics excluded as irrelevant); and *State v. Roe* (1989), 41 Ohio St.3d 18, 25, 535 N.E.2d 1351 (testimony of social worker deemed irrelevant). The admission or exclusion of relevant evidence lies within the sound discretion of the trial court. *State v. Sage* (1987), 31 Ohio St.3d 173, 31 OBR 375, 510 N.E.2d 343, paragraph two of the syllabus.

{¶ 68} Here, the trial judge did not err in excluding evidence related to other capitally indicted offenses in Lucas County. The admission of such evidence would have invited the jury to engage in a speculative analysis of sentencing disparity that is not authorized by law. The proportionality review mandated by R.C. 2929.05 is reserved for appellate courts and "is satisfied by 'a review of those cases already decided by the reviewing court in which the death penalty has been imposed.'" *State v. Sneed* (1992), 63 Ohio St.3d 3, 17, 584 N.E.2d 1160, quoting *Steffen,* 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383, paragraph one of the syllabus. Further, we rejected a similar argument in *Roe,* 41 Ohio St.3d at 25, 535 N.E.2d 1351, by upholding the trial court's exclusion of testimony regarding capitally indicted cases in Franklin County where defendants had received life sentences.

{¶ 69} The trial court also ruled correctly by not allowing Dixon to introduce his offer to plead guilty in exchange for dismissal of the death specifications. In *State v. Webb* (1994), 70 Ohio St.3d 325, 336, 638 N.E.2d 1023, we concluded that "[a] prosecutor's offer to negotiate a guilty plea in a capital case is not a mitigating factor under either R.C. 2929.04(B)(7) or the Eighth Amendment * * * [and] such an offer does not affect the appropriateness of the death penalty." See, also, *Sneed,* 63 Ohio St.3d at 16–17, 584 N.E.2d 1160. We also conclude that a defendant's offer to plead guilty, never accepted by the prosecutor, is not relevant to the issue of whether the defendant should be sentenced to death.

{¶ 70} Finally, the trial court's exclusion of proposed evidence regarding Dixon's prior incarceration on rape charges was harmless. Defense counsel had intended to introduce evidence that, prior to the murder, Dixon was exonerated after spending several months in jail on rape charges. The trial court should have permitted this evidence to be submitted for the jury's consideration as a

mitigating factor pursuant to R.C. 2929.04(B) because it fits within the "history, character, and background of the offender." See *State v. Stumpf* (1987), 32 Ohio St.3d 95, 100–101, 512 N.E.2d 598. See, also, *State v. White* (1999), 85 Ohio St.3d 433, 448, 709 N.E.2d 140. Nevertheless, our independent reassessment of the sentence will minimize any prejudicial impact. *State v. Lundgren* (1995), 73 Ohio St.3d 474, 486, 653 N.E.2d 304, citing *State v. Landrum* (1990), 53 Ohio St.3d 107, 115, 559 N.E.2d 710.

{¶ 71} Therefore, we overrule proposition of law No. 3.

{¶ 72} Dixon contends in proposition of law No. 7 that the trial court erred in instructing jurors to weigh his history, character, and background after it precluded him from introducing such evidence. Dixon argues in proposition of law No. 8 that the trial court erred in instructing the jury to weigh the nature and circumstances of the offense against the aggravating factors when he never presented the nature and circumstances of the offense as mitigating factors.

{¶ 73} At trial, defense counsel objected to including references to the nature and circumstances of the offense and Dixon's history, character, and background. Despite overruling the objection, the trial court's oral charge to the jury inadvertently failed to instruct the jury to weigh those factors in mitigation. The trial court subsequently submitted amended written instructions to the jury correcting this omission. Defense counsel maintained its earlier objection but did not object to submission of those omitted instructions to the jury in writing.

{¶ 74} The penalty-phase instructions were not erroneous. R.C. 2929.04(B) requires the jury to consider whether anything mitigating exists in the nature and circumstances of the offense and the history, character, and background of the offender. See *Steffen*, 31 Ohio St.3d at 116–117, 31 OBR 273, 509 N.E.2d 383; and *State v. Lorraine* (1993), 66 Ohio St.3d 414, 420, 613 N.E.2d 212. Moreover, the trial court made no improper comment regarding any mitigating factors not raised by Dixon. Thus, the trial court committed no error.

{¶ 75} Therefore, we deny Dixon's seventh and eighth propositions of law.

### Sentencing–Phase Errors

{¶ 76} In an issue not raised on appeal, we find that the trial court erred in its penalty-phase instructions regarding the aggravating circumstances that Dixon was found guilty of committing. Dixon was found guilty of two death specifications in connection with each of the three aggravated murder counts charged. The first specification alleged that Dixon committed aggravated murder during the course of a kidnapping and either was the principal offender or, if not, acted with prior calculation and design. See R.C. 2929.04(A)(7). The second specification used similar form language and charged Dixon with aggravated murder during an aggravated robbery. Id.

{¶ 77} The trial court, however, instructed the jury that the aggravating circumstances are as follows:

{¶ 78} "What are aggravating circumstances?  In this case, the aggravating circumstances are precisely set out in the specifications contained in your guilty verdict forms as to the [ninth, tenth, and eleventh] counts of the indictment. They are as follows:

{¶ 79} "That the defendant, Archie J. Dixon, caused the death of Christopher Hammer *with prior calculation and design and was the principal offender* in the aggravated murder.

{¶ 80} "Two:  That the defendant, Archie J. Dixon, caused the death of Christopher A. Hammer while the defendant was committing kidnapping and that the defendant was the principal offender in the aggravated murder.

{¶ 81} "Three:  That the defendant, Archie J. Dixon, caused the death of Christopher A. Hammer while the defendant was committing aggravated robbery, and the defendant was the principal offender in the aggravated murder." (Emphasis added.)

{¶ 82} The first purported aggravating circumstance referred to in the trial court's instructions is not one of the enumerated statutory aggravating circumstances set forth in R.C. 2929.04(A).  At best, it is an incomplete statement of a portion of R.C. 2929.04(A)(7).  "Prior calculation and design," however, should never be used in the conjunctive with "principal offender" because "prior calculation and design" is relevant in the specifications only if the defendant *is not* a principal offender.  See *State v. Penix* (1987), 32 Ohio St.3d 369, 371, 513 N.E.2d 744.  See, also, e.g., *State v. Holloway* (1988), 38 Ohio St.3d 239, 244, 527 N.E.2d 831, fn. 2.

{¶ 83} The aggravating circumstances that may be considered in imposing the death penalty are those specifically enumerated in R.C. 2929.04(A) and set forth in the indictment.  R.C. 2941.14.  Thus, the trial court clearly erred in instructing the jury as to the existence of a nonstatutory aggravating circumstance in this case.  See *Penix,* 32 Ohio St.3d at 370–372, 513 N.E.2d 744.  See, also, *State v. Johnson* (1986), 24 Ohio St.3d 87, 92–94, 24 OBR 282, 494 N.E.2d 1061.  The court of appeals similarly erred in its independent sentencing determination when it seemed to weigh three aggravating circumstances against the mitigating factors.  Defense counsel had objected to the erroneous instruction and, thus, preserved this issue for appellate review.

{¶ 84} For the following reasons, we conclude that the trial court's erroneous instruction is cured by our independent reassessment of the sentence.  See *State v. Cook* (1992), 65 Ohio St.3d 516, 527, 605 N.E.2d 70; *State v. Awkal* (1996), 76

Ohio St.3d 324, 335, 667 N.E.2d 960; *State v. Lott* (1990), 51 Ohio St.3d 160, 170, 555 N.E.2d 293; *Landrum,* 53 Ohio St.3d at 115, 559 N.E.2d 710.

{¶ 85} The indictment accurately reflected the statutory language set forth in R.C. 2929.04(A)(7), and the jury unanimously found Dixon guilty of committing both specifications. See, e.g., *State v. Dunlap* (1995), 73 Ohio St.3d 308, 315, 652 N.E.2d 988.

{¶ 86} A similar instruction resulted in reversible error in *Penix* because the trial court compounded its error by charging the jury that the presence of multiple aggravating circumstances should be given special weight. *Penix,* 32 Ohio St.3d at 372, 513 N.E.2d 744. Cf. *Jenkins,* 15 Ohio St.3d at 199, 15 OBR 311, 473 N.E.2d 264. Here, the trial judge gave no such instruction and did not otherwise compound his initial error. Thus, the trial court's erroneous instruction did not irrevocably taint the jury's deliberative process.

{¶ 87} Given the dearth of mitigating evidence in this case, the jury's determination was not adversely affected by the erroneous instruction. See *State v. Palmer* (1997), 80 Ohio St.3d 543, 574–575, 687 N.E.2d 685. During the sentencing phase, the only evidence offered in mitigation was Dixon's age at the time of the offense (R.C. 2929.04[B][4] ) and testimony computing the amount of jail time Dixon would serve if given a life sentence (R.C. 2929.04[B][7] ). In contrast, the evidence in this matter overwhelmingly proved the aggravating circumstances.

{¶ 88} Aggravated murder was charged under R.C. 2903.01(A), and the jury convicted Dixon of that charge. Thus, the jury by its verdict made a specific finding of prior calculation and design.

{¶ 89} Therefore, we find that the trial court's instructional error does not constitute grounds for reversal.

{¶ 90} In a related issue not raised on appeal, the prosecutor's penalty-phase closing argument improperly referred to prior calculation and design as a third aggravating circumstance. Defense counsel did not object. We find that the prosecutor's argument did not affect the outcome of Dixon's sentencing hearing. Overwhelming evidence supported the weight of the aggravating circumstances, and mitigating evidence was generally absent in this case.

### Trial Court's Sentencing Opinion

{¶ 91} Dixon contends in proposition of law No. 9 that the trial court's R.C. 2929.03(F) sentencing opinion was so fundamentally flawed that his death sentence must be vacated.

{¶ 92} Dixon argues that the trial court erred by failing to consider relevant mitigating evidence in its sentencing opinion. We considered this argument in connection with proposition of law No. 3. Admittedly, the trial court should have

considered evidence of Dixon's incarceration for rape, which was part of Dixon's "history, character, and background" pursuant to R.C. 2929.04(B). However, our independent review of the sentence will eliminate any prejudice. See *Lundgren*, 73 Ohio St.3d at 486, 653 N.E.2d 304.

{¶ 93} Dixon next points out that the trial court's sentencing opinion improperly speculated about facts regarding the last minutes of the victim's life. In its opinion and judgment entry pursuant to R.C. 2929.03(F), the trial court stated:

{¶ 94} "When considering the manner in which Christopher A. Hammer was brutally beaten and then buried alive by this defendant; *the fear and torture the victim must have endured before he lapsed into a welcomed state of unconsciousness*, the Court finds that the aggravating factors outweigh the mitigating factors beyond a reasonable doubt." (Emphasis added.)

{¶ 95} In *State v. Wogenstahl* (1996), 75 Ohio St.3d 344, 357, 662 N.E.2d 311, we found that the prosecutor erred when he invited the jury to consider what the victim experienced and was thinking in her last moments of life "to the extent that it invite[d] the jury to speculate on facts not in evidence." See, also, *State v. Combs* (1991), 62 Ohio St.3d 278, 283, 581 N.E.2d 1071. In this case, however, the trial court's evaluation was based on evidence, not speculation. Hammer was kidnapped, repeatedly beaten, and buried alive by Dixon and Hoffner. Dixon's own confession indicated that Hammer had been "scared to death," "screaming and hollering" from the pain, and that Hammer had kept asking Dixon whether he was going to die. Dixon and Hoffner permitted Hammer, while restrained before an open grave, to smoke a final cigarette before they pushed him in and buried him alive. The deputy coroner testified that Hammer would have remained alive in his grave for eight minutes and would have been conscious for two to three minutes after burial. Thus, the trial court did not improperly speculate about facts not in evidence.

{¶ 96} Dixon contends that the trial court failed to set forth the reasons why the aggravating circumstances outweighed the mitigating factors as required of it by R.C. 2929.03(F). See *State v. Maurer* (1984), 15 Ohio St.3d 239, 15 OBR 379, 473 N.E.2d 768, paragraph three of the syllabus; *State v. Fox* (1994), 69 Ohio St.3d 183, 190–191, 631 N.E.2d 124. Here, the trial court set forth the two R.C. 2929.04(A)(7) aggravating circumstances that Dixon was found guilty of committing. The trial court also summarized the evidence establishing Dixon's guilt of the offenses charged. The court then outlined Dixon's mitigation evidence as including (1) his age (20) at the time of the offense pursuant to R.C. 2929.04(B)(4); and (2) testimony computing the amount of actual incarceration if the jury recommended a life sentence pursuant to R.C. 2929.04(B)(7). The trial court afforded very little weight to Dixon's age as a mitigating factor, finding that he had been a fully responsible adult at the time of the offense. The trial court

found nothing mitigating about the time Dixon would spend in prison serving a life sentence and gave no weight to this factor.

{¶ 97} The trial court's sentencing opinion did not clearly explain why the aggravating circumstances outweighed the mitigating factors. However, the trial court's reasoning implicitly concluded that the aggravating circumstances, which were proved beyond a reasonable doubt, clearly outweighed the little mitigating evidence presented. Our independent assessment will purge any deficiency in the trial court's reasoning. See *Fox*, 69 Ohio St.3d at 191, 631 N.E.2d 124; *Maurer*, 15 Ohio St.3d at 247, 15 OBR 379, 473 N.E.2d 768. Cf. *State v. Green* (2000), 90 Ohio St.3d 352, 363–364, 738 N.E.2d 1208.

{¶ 98} Finally, Dixon argues that the trial court improperly weighed the nature and circumstances of the offense against the mitigating factors. However, Dixon fails to indicate where in the trial court's opinion this alleged error occurred.

{¶ 99} We conclude that the trial court's consideration of the nature and circumstances of the offense did not convert them into nonstatutory aggravating circumstances. *State v. Spirko* (1991), 59 Ohio St.3d 1, 11–12, 570 N.E.2d 229. See, also, *Bradley*, 42 Ohio St.3d at 148, 538 N.E.2d 373 (trial judge may rely on and cite the nature and circumstances of the offense as reasons supporting its finding that the aggravating circumstances were sufficient to outweigh the mitigating factors); *Stumpf*, 32 Ohio St.3d at 99–100, 512 N.E.2d 598. Here, the trial court correctly identified the two R.C. 2929.04(A)(7) aggravating circumstances specified in the indictment that Dixon had been found guilty of committing. See *State v. Clemons* (1998), 82 Ohio St.3d 438, 447, 696 N.E.2d 1009; *State v. Hill* (1995), 73 Ohio St.3d 433, 441, 653 N.E.2d 271.

{¶ 100} Based on the foregoing, we reject Dixon's proposition of law No. 9.

### Cumulative Error

{¶ 101} In proposition of law No. 11, Dixon contends that the cumulative effect of errors committed during his trial requires reversal of his conviction. Dixon's argument merely restates his previous propositions of law. Dixon received a fair trial, and any errors committed during trial were harmless or nonprejudicial. See, e.g., *State v. Goff* (1998), 82 Ohio St.3d 123, 140, 694 N.E.2d 916. "Such errors cannot become prejudicial by sheer weight of numbers." *State v. Hill* (1996), 75 Ohio St.3d 195, 212, 661 N.E.2d 1068, citing *State v. Davis* (1991), 62 Ohio St.3d 326, 348, 581 N.E.2d 1362. We therefore reject proposition of law No. 11.

### Constitutional Issues

{¶ 102} Dixon contends in proposition of law No. 12 that Ohio's death-penalty law misapplies R.C. 2929.05(A) by requiring courts to limit proportionality review

to those cases where the sentence of death has been imposed. This claim is rejected on the authority of *Steffen*, 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383, paragraph one of the syllabus. See *State v. Murphy* (1992), 65 Ohio St.3d 554, 583, 605 N.E.2d 884; *State v. Davis*, 62 Ohio St.3d at 351, 581 N.E.2d 1362. But, see, *State v. Murphy* (2001), 91 Ohio St.3d 516, 562, 747 N.E.2d 765 (Pfeifer, J., dissenting).

{¶ 103} In proposition of law No. 13, Dixon argues that imposition of the death penalty upon him is "freakish, capricious, and arbitrary." We reject this proposition. See *Bey*, 85 Ohio St.3d at 502–503, 709 N.E.2d 484.

{¶ 104} We also deny Dixon's proposition of law No. 14. Ohio's death-penalty scheme is constitutional. See *Evans*, 63 Ohio St.3d at 253–254, 586 N.E.2d 1042; *State v. Smith* (1991), 61 Ohio St.3d 284, 294, 574 N.E.2d 510; *State v. Lott* (1990), 51 Ohio St.3d 160, 170, 555 N.E.2d 293; *State v. Taylor* (1997), 78 Ohio St.3d 15, 32, 676 N.E.2d 82; and *State v. Jenkins* (1994), 15 Ohio St.3d 164, 177–178, 15 OBR 311, 473 N.E.2d 264.

## INDEPENDENT SENTENCE EVALUATION

### Penalty Hearing

{¶ 105} Dixon presented little in the way of mitigation evidence. Defense counsel established that Dixon was 20 years old at the time of the offense. See R.C. 2929.04(B)(4). In addition, Sally Ann Walters, Chief of the Bureau of Sentence Computation for the Ohio Department of Rehabilitation and Correction, testified as to the length of time that Dixon would remain incarcerated should the jury not recommend a death sentence. See R.C. 2929.04(B)(7).

### Sentence Evaluation

{¶ 106} After independent assessment, we find that the evidence proves beyond a reasonable doubt the two R.C. 2929.04(A)(7) aggravating circumstances charged against Dixon. Dixon purposely caused the death of Hammer during a kidnapping and an aggravated robbery and was a principal offender in the aggravated murder. See *State v. Keene* (1998), 81 Ohio St.3d 646, 655, 693 N.E.2d 246 (there can be more than one principal offender). See, also, *State v. Stojetz* (1999), 84 Ohio St.3d 452, 458–459, 705 N.E.2d 329.

{¶ 107} We find nothing in the nature and circumstances of the offenses to be mitigating. Dixon, codefendant Hoffner, and the victim were friends and former housemates. Dixon and Hoffner killed Hammer in order to steal his car. Hammer was brutally beaten, bound to a ladder, and robbed. When attempts to break Hammer's neck failed, Dixon and Hoffner drove him to a wooded area, permitted him to smoke a final cigarette, said a prayer, and then buried him alive. Dixon then assumed Hammer's identity and sold his car.

{¶ 108} In mitigation, the defense counsel presented no specific evidence regarding Dixon's history, character, and background. The defense did attempt to introduce evidence regarding Dixon's arrest and incarceration on rape charges. The trial court erred in excluding this evidence. However, we conclude that this factor has little, if any, relevance to whether Dixon should be sentenced to death. See *Holloway*, 38 Ohio St.3d at 242, 527 N.E.2d 831. See, also, *White*, 85 Ohio St.3d at 448, 709 N.E.2d 140 ("In Eighth Amendment jurisprudence, mitigating factors are facts about the defendant's character, background, or record, or the circumstances of the offense, that may call for a penalty less than death"). In addition, during the trial phase, minimal facts regarding Dixon's history, character, and background were presented. None of this evidence is mitigating.

{¶ 109} Dixon did not present any evidence on the remaining statutory mitigating factors. Thus, the following factors are inapplicable: R.C. 2929.04(B)(1) (victim inducement), (B)(2) (duress, coercion, or strong provocation), (B)(3) (mental disease or defect), (B)(5) (lack of significant criminal history), and (B)(6) (limited participation).

{¶ 110} Dixon was 20 years old at the time of the offense. Therefore, we accord some weight to his youth under R.C. 2929.04(B)(4). *State v. Stallings* (2000), 89 Ohio St.3d 280, 300, 731 N.E.2d 159 (age of 20 entitled to some weight in mitigation); *State v. Baston* (1999), 85 Ohio St.3d 418, 431, 709 N.E.2d 128 (age of 20 entitled to some weight).

{¶ 111} Finally, we decide that the testimony regarding the sentencing computations is entitled to no weight in mitigation. *White*, 85 Ohio St.3d at 448–449, 709 N.E.2d 140 (length of incarceration to be served before parole eligibility is not a mitigating factor for Eighth Amendment purposes, nor is excluding information regarding parole eligibility violative of Due Process in this case). See, also, *State v. Lynch*, 98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185, at ¶ 114–119.

{¶ 112} After considering the fact that the trial court improperly instructed the jury regarding the aggravating circumstances in this case and the other penalty-phase errors stated, we nevertheless decide that Dixon's death sentence should be affirmed. Based on the evidence, the aggravating circumstances of murder during a kidnapping and robbery outweigh Dixon's minimal mitigating evidence. Therefore, the death sentence is appropriate in this case.

{¶ 113} Finally, the death penalty imposed here is proportionate to death sentences approved in other cases involving murder accompanied by kidnapping and aggravated robbery. See, e.g., *State v. Coley* (2001), 93 Ohio St.3d 253, 273, 754 N.E.2d 1129; *Moore*, 81 Ohio St.3d at 44, 689 N.E.2d 1; *State v. Henness* (1997), 79 Ohio St.3d 53, 69, 679 N.E.2d 686; *Cook*, 65 Ohio St.3d at 531, 605 N.E.2d 70; and *Roe*, 41 Ohio St.3d at 28–29, 535 N.E.2d 1351.

{¶ 114} Accordingly, we affirm the convictions and sentences including the sentence of death.

Judgment affirmed.

MOYER, C.J., RESNICK, F.E. SWEENEY, O'CONNOR and O'DONNELL, JJ., concur.

LUNDBERG STRATTON, J., concurs in part and dissents in part.

---

**LUNDBERG STRATTON, J., concurring in part and dissenting in part.**

{¶ 115} Although I concur with the majority in affirming the defendant's convictions and sentence, I dissent with respect to two issues. First, I dissent from the majority's decision that the trial court's exclusion of evidence regarding Dixon's prior incarceration on rape charges was harmless error. I would find no error at all. Dixon was charged with a rape that, it was discovered after he had spent several months in jail, he did not commit. The majority concludes that the trial court should have permitted this evidence to be submitted for the jury's consideration as a mitigating factor pursuant to R.C. 2929.04(B) because it fits within the "history, character, and background of the offender."

{¶ 116} I dissent from this conclusion. Although in this instance it was the defendant himself who sought the admission of this evidence, I would nonetheless find that this evidence was irrelevant and added nothing mitigating about his "history, character, and background." Therefore, I believe that the trial court properly excluded this evidence.

{¶ 117} Second, I dissent from the majority's conclusion that "prior calculation and design" should never be used in the conjunctive with "principal offender." The majority cites *State v. Penix* (1987), 32 Ohio St.3d 369, 371, 513 N.E.2d 744; and *State v. Holloway* (1988), 38 Ohio St.3d 239, 244, 527 N.E.2d 831, fn. 2.

{¶ 118} In *Penix,* this court held that "[p]rior calculation and design is an aggravating circumstance only in the case of an offender who did not personally kill the victim. Thus, the criteria set forth in R.C. 2929.04(A)(7) are constructed in the alternative. If the aggravated murder was committed during the course of one of the enumerated felonies, then the death penalty may be imposed only where the defendant was the principal offender (i.e., the actual killer), or where the defendant was not the principal offender, if he committed the murder with prior calculation and design. The language of the statute provides that these are alternatives which are not to be charged and proven in the same cause. Thus, if the defendant is found to be the principal offender, then the aggravating circumstance is established, and the question of whether the offense was committed with prior calculation and design is irrelevant with respect to the death sentence." *Penix,* 32 Ohio St.3d at 371, 513 N.E.2d 744.

{¶ 119} Although this court has continually cited *Penix* for the proposition that "principal offender" and "prior calculation and design" are mutually exclusive, I have always disagreed with the court's interpretation of R.C. 2929.04(A)(7) in *Penix*. I believe that the General Assembly intended that when both factors are present, i.e., the defendant is the principal offender *and* the defendant committed the murder with prior calculation and design, the jury should hear evidence of both and should consider evidence of both when weighing the aggravating circumstances and mitigating factors.

{¶ 120} I believe that our court misinterpreted R.C. 2929.04(A)(7) in *Penix*. I would find that the principal-offender factor and the prior-calculation-and-design factor were not intended by the General Assembly to be mutually exclusive. Rather, I believe that the legislature meant that when the principal-offender factor is *not present* in the case, the state can still use (A)(7) if it can prove that the defendant committed the aggravated murder with prior calculation and design. But if both factors are present, both can be considered. Clearly, a defendant can be a principal offender while committing the aggravated murder with prior calculation and design. It is irrational to hold otherwise. I believe that it is confusing to prohibit a jury from considering both factors in its decision as to whether to impose the death penalty.

{¶ 121} Although the majority finds that this error was cured by our independent reassessment of the sentence, I would find that no such error occurred. This court should clarify *Penix* to establish that under R.C. 2929.04(A)(7), the state must prove *either* that the defendant was the principal offender *or* that the offender acted with prior calculation and design, but if both facts are established, the jury may consider evidence relating to *both* aggravating circumstances.

{¶ 122} Thus, I concur in the majority's conclusion with respect to affirming the convictions and sentence, but I respectfully dissent from the majority decision on the issues outlined above.

---

Julia R. Bates, Lucas County Prosecuting Attorney, and Craig T. Pearson, Assistant Prosecuting Attorney, for appellee.

Jeffrey M. Gamso and Annette L. Powers, for appellant.