OPINION
{¶ 1} This timely appeal comes for consideration upon the record in the trial court, the parties' briefs, and their oral arguments before this court. Defendant-Appellant, Eugene Green, appeals the decision of the Belmont County Court of Common Pleas, that convicted him of and sentenced him for assault; felonious assault, robbery, attempted theft, aggravated burglary, and failing to notify of a change of address while being a sex offender. On appeal, Green argues his counsel was ineffective; the trial court did not conduct a sufficient investigation into Green's claims that his counsel was ineffective; that many of his convictions were not supported by sufficient evidence; and, that the trial court erred when sentencing him to maximum and consecutive sentences. The arguments Green raises challenging his conviction are all meritless, but his sentence is vacated and this case is remanded for resentencing in accordance with State v. Foster, 109 Ohio St.3d 1, 2006-Ohio-0856.
 Facts {¶ 2} In July 2004, Renee Snider was living on her father's property in Belmont County with her two sons, her father, and her father's girlfriend, Tammy Datkuliak. Snider has previously been friends with Green, he had been to the family's residence, and the whole family knew who he was.
 {¶ 3} Snider worked overnight until the early morning hours of July 22, 2004, and Datkuliak picked her up after work and took her home. Snider went asleep in the basement, while Datkuliak took Snider's sons into a camper where Snider's father and Datkuliak slept. A couple of hours later, Datkuliak had to leave again to pick Snider's father up from his work and put Snider's two sons with Snider in the basement.
 {¶ 4} At approximately 7:00 am, Green jerked Snider awake by grabbing her ankle and told her that he was going to beat her. She asked him to leave and he walked out, but then walked back inside and began beating and kicking her. While Snider had been sleeping, Green had taken her children to the camper. When beating Snider, Green told her, "This is what you get." According to Snider, Green had both a knife and a hammer in his hands during this time.
 {¶ 5} Eventually, Datkuliak returned with Snider's father. In the meantime, Green had Snider take a bath to clean herself up. He and Snider then approached her father to speak to him and Green agreed to take one of Snider's friends home. After Green left, Snider told her father about the incident and he had her call the police. Green returned and Snider's father informed him that they had called the police. Green left and was not seen at the property again that day. The police who arrived at the scene took statements and discovered the hammer and knife which Green held during the assault.
 {¶ 6} That night, Snider and her children slept inside the camper with Datkuliak. The next morning Snider and Datkuliak exited the camper and were attacked by Green. He hit Datkuliak several times with a hammer before locking her in the camper, chasing Snider, and taking Snider to the basement again. Eventually, Green brought Snider, her children, and Datkuliak to the basement where he hit Snider with the blunt side of a machete and slashed Datkuliak's face with the machete. While Datkuliak was locked in the camper, she called the police, who responded while Green had the family in the basement. After seeing the police, Green disappeared behind the house into a wooded area.
 {¶ 7} Green was on parole at the time for rape and was subject to the reporting requirements for sexually oriented offenders, including notification of any change of address seven days before the change. After these incidents, his parole officer went to his last known address, only to discover that Green had not lived there for over a week. He had not notified the Sheriff of a change of address.
 {¶ 8} Since Green could not be located, local police were told to be aware of and on the lookout for Green. On July 26, 2004, Darl Burris was doing plumbing at a church when he approached his truck and saw Green standing next to it. Green was holding a hammer and told Burris that he needed Burris's truck because he was "in trouble" for "working over" two ladies. Burris gave Green the keys to his truck and later called police to report the theft.
 {¶ 9} On July 27, 2006, Green "busted in" to the home of Magdalene Lawson and demanded a firearm. Green had worked for Lawson's husband and suspected there was a firearm in the bedroom. He told Lawson that he may have to tie her and gag her while he looked for the gun. However, he eventually left Lawson's home without harming Lawson or taking anything with him. Lawson reported this incident to the police.
 {¶ 10} After Lawson's report to the police, the police knew Green was in Burris's vehicle and the general area he was in. With the assistance of aerial reconnaissance, the police located Green. Many units responded, including Deputy Stanley Gallownia, who was still in uniform while retuning home from work, but was driving his personal vehicle. Gallownia went to the location and took his keys with him when exiting his vehicle, but left the doors unlocked. As he approached Green's reported location, Green jumped out of a thicket and ran for Gallownia's truck. When Green reached the truck, he reached in toward the ignition area, but got out of the truck when he felt the keys were not there. After further pursuit, Green was apprehended and arrested.
 {¶ 11} On August 4, 2004, Green was charged with a seven count indictment containing the following charges: 1) aggravated burglary against Snider with a repeat violent offender specification based on Green's prior rape conviction; 2) felonious assault against Snider; 3) felonious assault against Datkuliak; 4) robbery against Burris; 5) attempted theft against Gallownia; 6) aggravated robbery against Lawson with a repeat violent offender specification based on Green's prior rape conviction; and, 7) kidnapping against Lawson with a repeat violent offender specification based on Green's prior rape conviction. Under a separate indictment filed on September 2, 2004, Green was also charged with failing to report his change of address in a timely fashion.
 {¶ 12} The case proceeded to a jury trial. At the conclusion of that trial, the jury acquitted Green of the aggravated burglary against Snider, the felonious assault against Snider, and the kidnapping against Lawson. However, it found Green guilty of the lesser included offense of assault against Snider and all other charges, including the repeat violent offender specification attached to the aggravated burglary against Lawson.
 {¶ 13} When sentencing Green, the trial court sentenced him to non-maximum sentences on all counts except for attempted theft and failure to report the change of address. It then ordered that portions of those various sentences be served consecutively, for a total of sixteen years imprisonment.
 Procedural Issues {¶ 14} After Green's appellate counsel filed a brief on his behalf, Green filed a document asking us to take note of additional issues which appellate counsel did not raise. However, that document did not provide any legal arguments in support of these "issues." Instead, it just noted that these issues can be seen in the record. Green has not asked this court for permission to file a brief supplementing the brief filed by his counsel and we have not granted him leave to do so.
 {¶ 15} App.R. 16(A)(7) requires that a brief contain an "argument containing the contentions of the appellant with respect to each assignment of error presented for review and the reasons in support of the contentions, with citations to the authorities, statutes, and parts of the record on which appellant relies." It is not our duty to search the record for evidence to support an appellant's argument as to alleged error and it is inappropriate for us to construct the legal arguments in support of an appellant's appeal. State v. Tuck, 146 Ohio App.3d 505,2001-Ohio-7017, at ¶ 19.
 {¶ 16} In this case, Green has done little more than furnish us with a list of possible issues which could affect his conviction. He has not presented this court with any arguments in support of any of these arguments. Accordingly, we cannot address the merits of the issues he has raised pro se in this appeal.
 Ineffective Assistance {¶ 17} In his first assignment of error, Green argues:
 {¶ 18} "The Appellant was denied a fair trial due to the ineffective assistance of trial counsel."
 {¶ 19} Green contends his trial counsel was ineffective in three different ways: 1) failing to call any witnesses on Green's behalf, 2) bolstering the State's case during cross-examination of Snider and Datkuliak by continuously questioning the witnesses about the attack on Datkuliak, and 3) failing to object to the trial court's answer to a jury question during deliberations. Green's arguments are meritless.
 {¶ 20} To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate counsel's performance was deficient and that deficient performance prejudiced the defense. Strickland v.Washington (1984), 466 U.S. 668, 687. A properly licensed attorney is presumed to execute his duties in an ethical and competent manner.State v. Smith (1985), 17 Ohio St.3d 98, 100. When reviewing whether counsel's performance was ineffective, courts must refrain from second-guessing strategic decisions of trial counsel. State v.Sallie, 81 Ohio St.3d 673, 674, 1998-Ohio-0343. Ineffectiveness is demonstrated by showing counsel's errors were so serious that he or she failed to function as the counsel guaranteed by the Sixth Amendment.State v. Hamblin (1988), 37 Ohio St.3d 153, 156. To establish prejudice, a defendant must show there is a reasonable possibility that, but for counsel's errors, the result of the proceeding would have been different. Strickland at 694. A reasonable probability must be a probability sufficient to undermine confidence in the outcome of the case. State v. Bradley (1989), 42 Ohio St.3d 136, paragraph three of the syllabus. The defendant bears the burden of proof in demonstrating ineffective assistance of counsel. Smith at 100.
 {¶ 21} Although Green challenges his trial counsel's decision not to call any witnesses in Green's defense, "counsel's decision whether to call a witness [generally] falls within the rubric of trial strategy and will not be second-guessed by a reviewing court." State v. Treesh,90 Ohio St.3d 460, 490, 2001-Ohio-0004. Furthermore, even if we were willing to second-guess counsel's strategic decision in this regard, Green cannot demonstrate how he was prejudiced by that decision. Such issues must be left for a possible post-conviction proceeding. Accordingly, Green's arguments about his counsel's effectiveness for not calling additional witnesses are meritless.
 {¶ 22} Likewise, Green's argument concerning his counsel's line of questioning on cross-examination of Snider and Datkuliak is merely an attack on counsel's trial strategy. "The extent and scope of cross-examination clearly fall within the ambit of trial strategy, and debatable trial tactics do not constitute lack of effective assistance of counsel." State v. Dixon, 101 Ohio St.3d 328, 2004-Ohio-1585, at ¶ 54.
 {¶ 23} In this case, counsel's trial strategy was to attack the credibility of these two witnesses. He continuously questioned Snider and Datkuliak about Green's alleged attack on Datkuliak because he intended to show that her injuries were inconsistent with their testimony. This allowed him to argue during closing arguments that neither Snider nor Datkuliak's testimony could be true. Counsel's performance in this regard was not deficient.
 {¶ 24} Finally, Green argues that his counsel was ineffective because he did not object to an answer the trial court gave to the jury in response to a jury question during their deliberations. In counts one, six, and seven of the indictment, Green was also charged with repeat violent offender specifications based on his previous conviction for rape. The verdict forms for those counts asked the jury to determine if Green was guilty of those offenses. If the jury found him guilty, the verdict forms asked the jury to determine whether Green had previously been convicted of rape. During deliberations, the jury asked the trial court, "What does the rape charge have to do with the indictment one, six, seven. What does this change, why do we sign? What will it change?" The trial court answered, with the agreement of counsel, "Simply answer the question if the verdict form indicates that you should. If you have questions after the trial in the matter above, further information will be provided."
 {¶ 25} Green argues that the verdict forms clearly confused the jury and that the trial court's answer did not clarify this confusion. However, the jury's question does not indicate confusion as much as it does curiosity. The jury did not understand the significance of a finding that Green had committed a rape in the past, but it was not necessary for the jury to understand that significance. Furthermore, the jury acquitted Green of two of the counts it asked about, counts one and seven. Thus, it does not appear that counsel's failure to ask for a different answer to the question was deficient. Finally, Green's argument that he was prejudiced by this answer is purely speculative.
 {¶ 26} Each of Green's arguments concerning counsel's effectiveness are meritless. Accordingly, his first assignment of error as a whole is meritless.
 Removal of Counsel During Trial {¶ 27} In his second assignment of error, Green argues:
 {¶ 28} "The trial court committed prejudicial error by not effectively preserving for appellate review the Appellant's request for removal of trial counsel."
 {¶ 29} Green contends that the trial court erred by not conducting a sufficient investigation into his claims that counsel should be removed. The Supreme Court of Ohio requires that a trial court inquire into claims of dissatisfaction with appointed counsel made by an indigent defendant during the course of a trial. State v. Deal (1969),17 Ohio St.2d 17, syllabus. The trial court may then require the trial to proceed with the defendant's assigned counsel if it finds that the defendant's complaint "is not substantiated or is unreasonable." Id. A trial court makes a sufficient record of its investigation into a defendant's complaint if it asks counsel why he did or did not take the actions which the defendant complains of. Id. at 20.
 {¶ 30} In this case, Green's counsel informed the trial court at the conclusion of the State's case that Green had no confidence in him and wished for counsel to be discharged. Counsel stated that Green wanted him to both recall Snider, Datkuliak, and Lawson and to call additional witnesses to testify about the relationship between he and Snider. The trial court then spoke with Green, to allow him to express exactly why he was dissatisfied with his counsel's performance. The trial court also allowed Green's counsel to explain why he did not wish to take the actions urged by Green. The trial court overruled Green's motion, finding that counsel's performance was "way above average."
 {¶ 31} The trial court's investigations into Green's complaints were sufficient. It allowed Green to express complaints with counsel's performance, listened to counsel's response to those complaints, and found that his complaints were unsubstantiated given counsel's performance so far. Green's arguments in his second assignment of error are meritless.
 Sufficiency of the Evidence {¶ 32} In his third assignment of error, Green argues:
 {¶ 33} "The trial court improperly overruled the Appellant's motion for acquittal pursuant to Criminal Rule 29 because there was insufficient evidence to support the Appellant's convictions."
 {¶ 34} Although Green contends that most of his convictions are not supported by sufficient evidence, many of his arguments sound more like manifest weight arguments. Arguments concerning the "sufficiency of the evidence" should not be confused with those addressing the "manifest weight of the evidence." See State v. Thompkins, 78 Ohio St.3d 380, 1997-Ohio-0052, paragraph two of the syllabus ("The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different.") "Sufficiency of the evidence" is "'a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." Id. at 386, quoting Black's Law Dictionary (6 Ed.1990) 1433. The relevant inquiry when determining whether the evidence is sufficient to support the verdict "is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus. " The verdict will not be disturbed unless the appellate court finds that reasonable minds could not reach the conclusion reached by the trier of facts." Id. at 273. Whether the evidence is legally sufficient is a question of law. Thompkins at 386.
 {¶ 35} In contrast, when reviewing whether a conviction was against the manifest weight of the evidence, an appellate court must "examine whether the evidence produced at trial `attains the high degree of probative force and certainty required of a criminal conviction."State v. Tibbetts, 92 Ohio St.3d 146, 163, 2001-Ohio-0132, quotingState v. Getsy, 84 Ohio St.3d 180, 193, 1998-Ohio-0533. In order to do this, a reviewing court must examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether the fact-finder clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. Id. "'Weight is not a question of mathematics, but depends on its effect in inducing belief." (Emphasis sic.) Thompkins at 387, quoting Black's Law Dictionary (6 Ed.1990) 1594.
 {¶ 36} In this appeal, Green has not challenged whether most of his convictions are against the manifest weight of the evidence and we will not analyze those issues. Instead, we will only address whether Green's convictions are supported by sufficient evidence.
 Robbery {¶ 37} Green argues that there is insufficient evidence to support his conviction for robbery since there is no evidence that he used or threatened the immediate use of force when stealing Burris' truck. The State contends that it did introduce such evidence since Green held a hammer at the time of the theft and the victim stated, "I knew that the truck wasn't worth somebody hitting me with a hammer."
 {¶ 38} R.C. 2911.02(A)(3) prohibits any person from "us[ing] or threatening] the immediate use of force against another" when "attempting or committing a theft offense or in fleeing immediately after the attempt or offense." "'Force' means any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." R.C. 2901.01(A)(1). Evidence of whether the victims actually perceived a threat is not necessary since the test for force or threat of force is objective and relies on the totality of the circumstances.In re Burton, 160 Ohio App.3d 750, 2005-Ohio-2210, at ¶ 7; State v.Habtemariam (1995), 103 Ohio App.3d 425, 429. "The use or threat of immediate use of force element of the offense of robbery, as expressed in R.C. 2911.02(A), is satisfied if the fear of the alleged victim was of such a nature as in reason and common experience is likely to induce a person to part with property against his will and temporarily suspend his power to exercise his will by virtue of the influence of the terror impressed." State v. Davis (1983), 6 Ohio St.3d 91, paragraph one of the syllabus. "[T]he threat of violence, compulsion, or constraint need not be direct and explicit; rather, it can be implied from the perpetrator's demeanor and tone of voice." State v. Bush (1997), 119 Ohio App.3d 146,150.
 {¶ 39} In this case, the victim, Burris, testified that Green said, "I'm not going to hurt you, but I'd like to have your truck," while holding a hammer. Green told Burris that he was "in trouble" and needed to "get away" because he had "worked over a couple of ladies down over the creek." Burris testified that Green's tone of voice was "natural," that he did not yell, and that he never raised the hammer. Burris stated that Green "didn't do anything to cause me to be fearful of him." Nevertheless, Burris allowed Green to take his truck because "the truck wasn't worth somebody hitting me with a hammer."
 {¶ 40} The Ohio Supreme Court has stated that the statement, "I'm not going to hurt you," does not belie what may otherwise be perceived as a threat. Davis at 94. "In fact, that statement could be interpreted to reinforce the threat, conveying the implication that the statement remains applicable only so long as no resistance is offered." Id.
 {¶ 41} Likewise, the Ohio Supreme Court has held that a defendant does not need to brandish a weapon in order to threaten the immediate use of force. In Davis, the defendant held his hand under his shirt as if he had a weapon while committing a theft offense and never verbally threatened harm. Nevertheless, the Ohio Supreme Court found that there was sufficient evidence of force to sustain the conviction.
 {¶ 42} Finally, Burris' testimony that he did not fear Green is not dispositive. As previously stated, the test for force is objective, and force is to be proven by the totality of the circumstances. Burton;Habtemariam. "Because the test is objective, proof of the victim's fear and apprehension is not necessary to establish the force element when it is possible for the jury to reasonably conclude that the defendant's statements, actions, and demeanor had that purpose and effect."Bush at 152.
 {¶ 43} In this case, there is sufficient evidence to prove that Green threatened the immediate use of force when he stole Burris' truck. Green was standing next to the truck and holding a hammer when he asked Burris for his truck. He told Burris, "I'm not going to hurt you," which could have communicated to Burris the possibility that Green has contemplated hurting hum. Finally, Burris testified that he gave his truck to Green because "the truck wasn't worth somebody hitting me with a hammer." These facts, when viewed in the light most favorable to the State, support Green's conviction for robbery and his arguments to the contrary are meritless.
 Attempted Theft {¶ 44} Green next contends that there is insufficient evidence supporting his conviction for attempted theft because the State failed to prove that he intended to deprive the owner of his truck. Green's arguments in this regard are also meritless.
 {¶ 45} R.C. 2913.02(A)(1) prohibits anyone "with purpose to deprive the owner of property or services" from "knowingly obtaining] or exert[ing] control over either the property or services * * * [w]ithout the consent of the owner or person authorized to give consent." Anyone who violates that section is guilty of theft. R.C. 2913.02(B)(1). R.C.2923.02(A) prohibits anyone from "purposely or knowingly, and when purpose or knowledge is sufficient culpability for the commission of an offense, shall engage in conduct that, if successful, would constitute or result in the offense."
 {¶ 46} In this case, Deputy Stanley Gallownia of the Belmont County Sheriff's Department was off-duty and on his way home from work when he heard that other officers were in pursuit of Green. He still had his uniform on and parked his personal truck near the scene of the pursuit. When he exited his vehicle, Deputy Gallownia took his keys and left his doors unlocked. After exiting his truck, the officer approached a thicket, indicated by a witness, when Green suddenly jumped up about ten feet away from him and began to run toward Deputy Galownia's truck. When Green reached the truck, he opened Gallownia's driver's side door and reached inside toward the ignition. When he felt that the keys were not in the ignition, Green exited the truck.
 {¶ 47} Green's argument that there is insufficient evidence of attempted theft borders on the frivolous. Green, a man on the run from police officers, saw an officer exit his personal vehicle. Once he had a chance, Green ran for the vehicle, hoping that the officer left his keys in his ignition. When he found out the keys were not there, Green continued his flight. The only reasonable conclusion, especially when these facts are viewed in the light most favorable to the State, was that Green was attempting to steal Gallownia's vehicle to further his getaway. His arguments to the contrary are meritless.
 Aggravated Burglary {¶ 48} Green maintains that his conviction for aggravated burglary is also not supported by sufficient evidence. He claims the State proved neither that he intended to commit a criminal offense when he entered Lawson's home nor that he inflicted, attempted to inflict, or threatened to inflict physical harm on Lawson.
 {¶ 49} Pursuant to R.C. 2911.11(A)(1), a person commits aggravated burglary when "by force, stealth, or deception, [the person] trespasses] in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense [and] [t]he offender inflicts, or attempts or threatens to inflict physical harm on another." "Physical harm" means "any injury, illness, or other physiological impairment, regardless of its gravity or duration." R.C. 2901.01(A)(3).
 {¶ 50} In this case, Green "busted in" Lawson's kitchen door on the afternoon of July 27, 2004, came in the building, and asked Lawson for a gun because "They're all after me." Lawson knew Green because Green worked with her husband. Lawson told Green that her husband had a gun, but that she was not going to give it to Green. Green told Lawson, "I might have to tie you up and gag you," because he was afraid that Lawson would call the police if he left her to look for the gun in the house. Green apparently thought there was a gun in Lawson's bedroom. Eventually, Green left after Lawson asked him to leave. At no time did Green yell at or touch Lawson.
 {¶ 51} When this evidence is viewed in the light most favorable to the State, it's clear that Green trespassed into the home with the intent of committing a criminal offense, stealing a firearm. He even contemplated tying up Lawson so he could search the home for a firearm unimpeded. Green's arguments that the State failed to prove this element of the offense is meritless.
 {¶ 52} Furthermore, the evidence, when viewed in the light most favorable to the State, shows that Green threatened to inflict harm on Lawson. He "busted in" her door, blocked her exit, told her he needed a firearm because he was on the run, and voiced his belief that he may have to tie and gag Lawson. Green's course of conduct and demeanor, when viewed in the light most favorable to the State, indicate that he was threatening physical harm to Lawson. The fact that Green did not carry out that threat does not mean that such a threat was not present. Green's arguments to the contrary are meritless.
 Failing to Notify of Address Change {¶ 53} Finally, Green contends that there is insufficient evidence to support his conviction for failing to register his new address. He contends that the evidence shows he had a long and compliant history of reporting his new addresses and that he could reasonably have been expected to do so at his next meeting with his probation officer. Green's arguments in this regard are frivolous.
 {¶ 54} Pursuant to the version of R.C. 2950.05 in effect at the time, Green was required to notify the Sheriff of his change of address at least seven days before he changed addresses. Former R.C. 2950.05(A). The failure to meet the notification requirements of R.C. 2950.05 is a fifth degree felony. Former R.C. 2950.99(A).
 {¶ 55} In this case, Green's parole officer testified that on July 22, 2004, he heard Green was involved in a crime and went to Green's last known address. The address was a residence belonging to Green's sister. A woman at the address testified that she had been living there for approximately one week and that Green was no longer living there. Green's sister told the officer that she had not seen Green at the address "for a good while." The county's sexual offender registrar testified that Green had not notified the Sheriff of a change of address, even though he was aware of the requirement and procedure and had followed the procedure in the past.
 {¶ 56} This evidence, when viewed in the light most favorable to the State, shows that Green knew of the notification requirement, but did not comply with that requirement in this case. Green's arguments to the contrary are frivolous.
 Sentencing {¶ 57} In his fourth and fifth assignments of error, Green argues:
 {¶ 58} "The trial court committed prejudicial error by sentencing the Appellant to consecutive terms in prison."
 {¶ 59} "The trial court committed error by imposing maximum sentences upon the Appellant for his convictions of attempted theft and failing to register his new address."
 {¶ 60} In these assignments of error, Green challenges the sentence imposed by the trial court. However, before Green's brief in this appeal was filed, the Ohio Supreme Court decided Foster. In Foster, the Ohio Supreme Court held that R.C. 2929.14(B), 2929.14(C), and 2929.14(E)(4), which respectively address non-minimum, maximum, and consecutive felony sentences, are unconstitutional because they violate a defendant's right to a jury trial. When reaching this conclusion, the court primarily relied on the United States Supreme Court's recent decisions inBlakely v. Washington (2004), 542 U.S. 296, decided on June 24, 2004, and United States v. Booker (2005), 543 U.S. 220, decided on January 12, 2005. Both Blakely and Booker were outgrowths of the Court's prior decision in Apprendi v. New Jersey (1999), 530 U.S. 466, 490, which held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."
 {¶ 61} The State concedes that Green's sentence was unconstitutional under Foster, but urges that this court simply affirm the trial court's sentencing decision since Foster eliminated the need for a trial court to make the formerly required findings and give the formerly required reasons. However, we have held that the Ohio Supreme Court has mandated that we remand all cases pending on direct review affected byFoster. State v. West, 7th Dist. No. 05 JE 41, 2006-Ohio-3096, at ¶ 33-38. We must follow the Ohio Supreme Court's mandate and remand this case for resentencing in accordance with Foster. Green's fourth and fifth assignments of error are meritorious.
 Conclusion {¶ 62} Green argues his counsel was ineffective, the trial court did not conduct a sufficient investigation into Green's claims that his counsel was ineffective, that many of his convictions were not supported by sufficient evidence, and that the trial court erred when sentencing him to maximum and consecutive sentences. The arguments Green raises in his first, second and third assignments of error challenging his conviction are all meritless and Green's conviction is affirmed. However, Green's fourth and fifth assignments of error with regard to his sentence are meritorious. Accordingly, Green's sentence is vacated and this case remanded to the trial court for resentencing in accordance with Foster.
Donofrio, P.J., concurs.
Waite, J., concurs.