OPINION
{¶ 1} Defendant-appellant, William H. Parsons, appeals from a judgment of the Franklin County Court of Common Pleas finding him guilty of (1) theft in violation of R.C. 2913.02, a fifth-degree felony; (2) two counts of burglary in violation of R.C. 2911.12, second-degree felonies; (3) aggravated burglary in violation of R.C. 2911.11, a first-degree felony; and (4) robbery in violation of R.C. 2911.02, a third-degree felony. Because the trial court did not commit reversible error in the challenged evidentiary issues, but because the sufficiency and manifest weight of the evidence do not support *Page 2 
defendant's theft and aggravated burglary convictions, we modify the judgment and affirm as modified.
 {¶ 2} By indictment rendered on October 4, 2005, defendant was charged with ten felony counts for a series of events committed between September 10 and September 24, 2005 against the person and property of his parents, Clyde and Alma Parsons: (1) aggravated burglary of Clyde and Alma's residence on September 17; (2) burglary of Clyde and Alma's residence on September 11; (3) burglary of Clyde and Alma's residence on September 13; (4) burglary of Clyde and Alma's residence on September 24; (5) robbery of Clyde on September 24; (6) robbery of Clyde on September 24; (7) robbery of Alma on September 24; (8) robbery of Alma on September 24; (9) breaking and entering Clyde's dry cleaning business on September 17; and (10) theft of Clyde and Alma's laptop on September 10.
 {¶ 3} According to the state's evidence, defendant lived with his sister for the three or four months leading up to September 10. Having heard defendant's sister evicted him for resuming his cocaine use, Clyde and Alma on September 10 took defendant to dinner to watch an Ohio State football game at Damon's restaurant. After the game, the three went to Clyde and Alma's residence at 2542 Steele Avenue, where defendant was to sleep on the couch before looking for a place to live the following day. When Clyde and Alma awoke the next morning, defendant was gone, as was Clyde's laptop computer; the couple filed a police report. Defendant later acknowledged he took the laptop, and he offered to get it back for his parents.
 {¶ 4} After Clyde and Alma filed a police report for the missing computer on September 11, the couple locked their house and went to the laundromat for two and *Page 3 
one-half hours. Upon their return, the doors were still locked. When they walked into the kitchen they noticed the window and window screen over the kitchen sink were ajar, and they found the window-sill knickknacks in the sink. Alma immediately suspected defendant was the culprit. The couple searched the house and found everything in place except a missing metal container of change Alma kept under her bed.
 {¶ 5} Two days later, on September 13, defendant unexpectedly showed up at Clyde and Alma's house and asked for something to eat and clean clothes to wear for a job he was to start the next day. While Clyde and Alma worked on a computer in another room, defendant went into their bedroom, took a t-shirt from Clyde's dresser drawer and then slipped out of the house. The couple soon realized defendant was gone and found missing from their bedroom the bank bag from Clyde's dry cleaning business containing around $100 and the keys to the business. The couple called the police and filed a report. Defendant some time later acknowledged to Clyde that he had the bank bag and keys, and he returned them.
 {¶ 6} On Saturday, September 17, Clyde arrived at work and discovered the cash register drawer pried open; the main doors to the business showed no sign of forced entry. A roll of nickels and a few dollars from a charity Red Cross container were missing. When Clyde confronted defendant about the matter, defendant explained that his acquaintances took the key without his knowledge and then returned the key after entering the store.
 {¶ 7} On September 24 around 12:30 a.m., Clyde and Alma awoke to "a horrendous noise coming from downstairs." (Tr. Vol. I, 47.) A later inspection revealed the back door "was ripped completely out of the door frame * * *." Id. at 50. Defendant was *Page 4 
coming up the stairs by the time Clyde and Alma arose from their bed; he appeared frantic and high on drugs. Defendant said someone was chasing him and he needed a ride to the bus station to get out of town. He also said he needed money, and, being denied that, he began rifling through Clyde and Alma's bedroom dresser drawers until he found the bank bag from Clyde's dry cleaning business in the bottom of a bedroom closet. Clyde and Alma provided varying accounts of the ensuing situation.
 {¶ 8} Alma testified she was scared as Clyde and defendant struggled over the bag. Clyde wrestled the bag away from defendant and turned to give the bag to Alma. According to Alma, defendant apparently pushed Clyde down, allowing defendant to take the bag from Clyde, and then left the house. According to Clyde, once defendant saw the bag, Clyde pushed defendant against a dresser to make defendant think about what he was doing. Defendant slid by Clyde as Clyde spun around and fell over a laundry basket on the floor, and defendant left with the bag. Clyde testified that it was not a hostile situation, he did not feel threatened, and he did not struggle with defendant. The couple reported the episode to the police.
 {¶ 9} Defendant returned to Clyde and Alma's house around 6:30 that same morning. Alma testified defendant pushed his way through the damaged back door and began yelling that he needed money. Defendant took five dollars from Clyde's wallet and left with Alma's last pack of cigarettes.
 {¶ 10} Defendant was later arrested and indicted. He waived his right to a jury trial and after a two-day bench trial, the court found defendant guilty of Counts 1, 2, 3, 4, 6, and 10, but not guilty of Count 5; the court merged Count 4 with Count 1, and Counts 5, 7, 8 and 9 were dismissed at trial. The court imposed four-year sentences on Counts 1, 2, *Page 5 
3, and 6 and a one-year sentence on Count 10, with all sentences to be served concurrently.
 {¶ 11} Defendant appeals, assigning three errors:
 FIRST ASSIGNMENT OF ERROR
 The trial court erred in admitting highly damaging and unfairly prejudicial evidence of other bad acts in violation of Evid.R. 404(B) and prohibitions against hearsay as set forth in Evid.R. 801 and 802.
 SECOND ASSIGNMENT OF ERROR
 The trial court erred in preventing Appellant during cross examination from using diary entries written by a prosecution witness to prove bias, thereby denying him the right to confront his accuser, in violation of the Sixth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution.
 THIRD ASSIGNMENT OF ERROR
 The jury verdict was not supported by sufficient credible evidence and was against the manifest weight of the evidence. As a result, Appellant was denied due process protections under the state and federal Constitutions.
 I. First Assignment of Error
 {¶ 12} Defendant's first assignment of error contends the trial court improperly allowed hearsay evidence of other bad acts in violation of Evid.R. 404(B) and 802. Defendant challenges Alma's testimony that defendant no longer lived with his sister because "[h]e started using cocaine again * * *." (Tr. Vol. I, 23.) He also objects to her testimony that defendant's drug use caused him to "pawn" his parents' property and to borrow money from his parents to buy the property back. Id. at 28-29. Defendant *Page 6 
concludes the testimony was inadmissible hearsay that improperly contributed to his convictions by portraying him as a drug addict with a propensity to steal.
 {¶ 13} Evid.R. 404(B) proscribes evidence of other crimes, wrongs, or acts "to prove the character of a person in order to show that he acted in conformity therewith." Evidence showing other "bad acts" may be admissible, however, for other purposes, "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Id. Thus, evidence of drug addiction or abuse is admissible under Evid.R. 404(B) if relevant to a noncharacter issue, such as a possible motive to steal. State v. Tibbets (2001),92 Ohio St.3d 146, 161, citing State v. Henness (1997), 79 Ohio St.3d 53, 61. Because Alma's challenged testimony revealed defendant's possible motive to steal, her testimony was admissible under Evid.R. 404(B). Even if, however, Alma's testimony was inadmissible under Evid.R. 404(B), any error was harmless because the trial court, in a bench trial, presumably considered only the relevant, material, and competent portion of Alma's challenged testimony. State v. Addison, Franklin App. No. 03AP-1102,2004-Ohio-5154, at ¶ 10, citing State v. Bays (1999), 87 Ohio St.3d 15. To the extent defendant argues Evid.R. 403(A), he did not assert it in the trial court, and we thus do not address it on appeal.
 {¶ 14} Defendant also contends the trial court improperly allowed Alma's testimony in violation of Evid.R. 802. Defendant asserts that because the events that precipitated his expulsion from his sister's house occurred outside Alma's presence, the court should have precluded Alma's testimony on the matter. Evid.R. 802 forbids introducing an out-of-court statement to prove the truth of the matter asserted. See Evid.R. 801. Although hearsay testimony may be cause for reversal because it prejudicially affects a jury, in a *Page 7 
bench trial the court is presumed capable of disregarding improper testimony. See Addison, supra. Here, we cannot determine with certainty whether the evidence was offered for the truth of the matter asserted or to show Alma's subjective belief as the basis for her reactions to defendant. Given that uncertainty, coupled with the nature of a bench trial and the record's failure to reveal that the court was influenced by or considered Alma's hearsay testimony in arriving at its judgment, we do not find merit in defendant's argument. Accordingly, defendant's first assignment of error is overruled.
II. Second Assignment of Error
 {¶ 15} Defendant's second assignment of error contends the trial court erred in preventing defendant from cross-examining Alma with her ten-year-old diary entries to prove bias. Defendant proffered that in those entries Alma then "thought it would be best for the entire family if [defendant] committed suicide." (Tr. Vol. II, 4.) Defendant suggests that sentiment demonstrates the extent of Alma's bias toward defendant and reveals a motive for her to perjure her testimony: to remove defendant's disruptive force from the family. Defendant argues that because Alma's and Clyde's testimony differed on many important elements of the charges against defendant, cross-examination with the entries was fundamental to discrediting Alma's more damaging interpretation of the events at issue. By preventing defendant from cross-examining Alma with content from the diary entries, defendant concludes the trial court denied him his fundamental right to confront a witness under the federal and state constitutions.
 {¶ 16} The confrontation clause, as found in the Sixth Amendment to the United States Constitution and Section 10, Article I, Ohio Constitution, guarantees an accused the right to confront and cross-examine witnesses testifying against him or her. Pointer v.Texas *Page 8 
(1965), 380 U.S. 400, 406; see State v. Self (1990), 56 Ohio St.3d 73,78 (construing Section 10, Article I to parallel that of the federal constitution). Although the confrontation clause centrally concerns the reliability of evidence offered against a criminal defendant, it does not prevent a trial court from imposing limits on a defendant's questions directed to the credibility or bias of a state's witness. SeeDelaware v. Van Arsdall (1986), 475 U.S. 673, 679 (stating the trial court retains "wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant"). In determining such matters, a trial court maintains broad discretion, and a reviewing court will not disturb the trial court's rulings absent an abuse of discretion. State v.Myers, 97 Ohio St.3d 335, 348, 2002-Ohio-6658.
 {¶ 17} Evid.R. 616(A) provides that a witness may be impeached by examination or extrinsic evidence to show "bias, prejudice, interest, or any motive to misrepresent"; Evid.R. 611(B) allows cross-examination of all relevant matters and issues that may affect credibility. Together, they establish that cross-examination evidence relating to lack of credibility and bias has probative weight.
 {¶ 18} The proffered content of Alma's decade-old diary entries, although attenuated in time and logic, indicates the extent of Alma's negative feelings and profound resentment toward defendant and possibly reveals a motivation to testify against him. Still, any error in denying defendant's cross-examination with the diary's contents was harmless: the court, as trier of fact, was privy to numerous examples of how defendant's conduct over the years had negatively affected Alma's feelings toward defendant. *Page 9 
 {¶ 19} When directly asked why she was testifying and how defendant's behavior affected her life, Alma testified that she loved her son "even though he may not think so, but I have also been through a lot of verbal and emotional abuse over the last few years." (Tr. Vol. I, 61.) On cross-examination, Alma repeated, "My feelings toward my son are that I love him very much. I hate what he is doing to himself and to what he has done with us. I wish he could begin to make correct choices and have the life that he should have." Id. at 107. She described defendant's dropping out of high school and heavy drug use and mentioned his journey through juvenile prison and rehabilitation. Alma testified defendant's recent return to school was the "first positive upturn" in his life "in the last few years." Id. at 111. Alma explained that her testimony probably differed from Clyde's because she "can't fix anything for [defendant] like I could when he was little. [Clyde] still wants to fix." Id. at 62.
 {¶ 20} In short, even without cross-examination on the content of Alma's ten-year-old diary entries, the trial court received an understanding of how defendant's conduct affected Alma's feelings toward him and thus was apprised of the deep-seeded feelings that may have influenced her testimony. Accordingly, defendant's second assignment of error is overruled.
III. Third Assignment of Error
 {¶ 21} Defendant's third assignment of error challenges the sufficiency and manifest weight of the evidence sustaining his convictions. Whether the evidence is legally sufficient to sustain a verdict is a question of law. State v. Thompkins (1997),78 Ohio St.3d 380, 386. Sufficiency is a test of adequacy. Id. We construe the evidence in a light most favorable to the prosecution and determine whether a rational trier of fact could *Page 10 
have found the essential elements of the offense proven beyond a reasonable doubt. State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus; State v. Conley (Dec. 16, 1993), Franklin App. No. 93AP-387.
 {¶ 22} When presented with a manifest weight argument, we engage in a limited weighing of the evidence to determine whether sufficient competent, credible evidence supports the jury's verdict to permit reasonable minds to find guilt beyond a reasonable doubt.Conley, supra; Thompkins, at 387 (noting that "[w]hen a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a `thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony"). Determinations of credibility and weight of the testimony remain within the province of the trier of fact. State v.DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus.
 {¶ 23} Defendant first contends insufficient evidence supports his theft conviction of the laptop computer as a felony of the fifth degree. R.C. 2913.02 governs the offense of theft and states, in pertinent part, "[n]o person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services * * * [w]ithout the consent of the owner or person authorized to give consent[.]" A violation of R.C. 2913.02 is classified as petty theft, a misdemeanor of the first degree. If, however, "the value of the property or services stolen is five hundred dollars or more and is less than five thousand dollars[,]" the violation is classified as a fifth-degree felony. R.C. 2913.02(B)(2). The value of property stolen "is the cost of replacing the property with new property of like kind and quality." R.C. 2913.61(D)(2) (determining the value of household goods and equipment used in the business of its owner). *Page 11 
 {¶ 24} Here, Alma testified that she and Clyde purchased the stolen laptop from their joint business account for $800 in December 2004. An order confirmation page from Dell, Inc., admitted as an exhibit, revealed the laptop was purchased for $818 on December 4, 2004. Clyde testified that based on his experience selling computers for WinBook and Sun TV, the laptop was only worth between $200 and $300 at the time of its theft because technology changed since December 2004. Clyde further estimated that a replacement laptop with similar technology would cost between $450 and $499. The trial court did not find Clyde's testimony credible: "[i]f [the] computer in that nine-month period had been greatly diminished in value," the parents "would not have bothered to get on the internet * * *, to print off the record, * * * and to track down exactly what they paid for the computer nine months earlier." The court concluded the stolen laptop was worth more than $500.
 {¶ 25} Even when the evidence is construed in favor of the state, it fails to establish beyond a reasonable doubt the stolen laptop's replacement cost exceeded $500. The state failed to present direct evidence of replacement cost but instead relied solely upon the laptop's purchase price, specifying neither the status of the laptop's technology, the devaluation rate, nor other details essential to allow the court to ascertain the laptop's replacement cost nine months after the purchase of such rapidly depreciating technology. We recognize that in some instances the purchase price may sufficiently establish the minimum value needed to classify a theft as a felony under R.C. 2913.02, such as when a substantial difference separates the purchase price and the felony theft minimum threshold, or when the time elapsed between the purchase and theft is relatively short and the property's value is historically stable. See, e.g., State v. Corley (Apr. 26, *Page 12 
1999), Stark App. No. 1998CA00169; State v. Whitted (Oct. 20, 1983), Cuyahoga App. No. 46586.
 {¶ 26} Here, however, the marginal difference between the purchase price and the felony theft minimum threshold, coupled with the uncertainty of the computer's diminished value that rapidly advancing technology over a nine-month period may cause, renders insufficient the state's attempt to establish that the stolen laptop's replacement cost exceeded $500. Instead, the evidence forced the trial court to speculate, in the face of evidence to the contrary from Clyde, that the stolen laptop's replacement cost did not decrease by more than $300 between its purchase and theft. Accordingly, defendant's fifth-degree felony theft conviction is reduced to a first-degree misdemeanor.State v. Massey (Nov. 28, 2000), Franklin App. No. 99AP-1355.
 {¶ 27} Defendant next contends the sufficiency and manifest weight of the evidence fail to support his September 11, 13, and 24 burglary convictions because he was privileged to enter his parents' house. In defining burglary, R.C. 2911.12(A)(1) provides that "[n]o person shall by force, stealth, or deception, * * * [t]respass in an occupied structure, * * * when another person other than an accomplice of the offender is present, with purpose to commit in the structure * * * any criminal offense[.]" A person criminally trespasses when he or she "knowingly enter[s] or remain[s] on the land or premises of another * * * without privilege to do so[.]" R.C. 2911.21(A)(1). Privilege is defined as "an immunity, license, or right conferred by law, bestowed by express or implied grant, arising out of * * * [a] relationship." R.C.2901.01(A)(12).
 {¶ 28} Clyde testified that defendant was living at Alma's and his house from September 10 through September 24; defendant showered, ate, and received mail at *Page 13 
their house. Over 50 percent of the time defendant slept there, but he never stayed the entire night unless Clyde and Alma were present. Clyde stated the couple occasionally let defendant stay alone at their house when they left for part of the day. By contrast, Alma testified that defendant at one time lived in the house and was occasionally invited to stay the night. At the time of the incidents subject of the trial, however, defendant did not live there and was not welcome in the house unless she or Clyde were present. (Tr. Vol. I, 112.) Clyde and Alma both testified that defendant did not have a key to their house.
 {¶ 29} From that evidence, the court reasonably could conclude that defendant generally was privileged to enter his parents' house from September 10 to September 24, but his privilege was limited to times when either Clyde or Alma allowed him entrance. While defendant was often permitted to enter the house, that circumstance did not obviate his need for permission, especially since defendant did not possess a key to the house. Sufficient evidence therefore allows reasonable minds to conclude that defendant entered Clyde and Alma's house without privilege when he forced his way through the kitchen window and back door on September 11 and 24, respectively, in the couple's absence and without express permission.
 {¶ 30} Further, although Clyde and Alma permitted defendant to enter their house on September 13, the court was justified in inferring defendant's privilege terminated when he snuck into Clyde and Alma's room to steal the bank bag from Clyde's dry cleaning business. State v.Thompson (Nov. 10, 1997), Franklin App. No. 97APA04-489 (finding privilege can terminate with commission of a crime), citing State v.Steffen (1987), 31 Ohio St.3d 111; State v. Divincenzo (Dec. 4, 2006), Medina App. No. 05CA0105-M; see, also, State v. Riley (Mar. 17, 1995), Lucas App. No. L-94-007 (finding privilege *Page 14 
revoked even though crime committed against someone other than one who gave the accused permission to enter).
 {¶ 31} Defendant additionally argues that without fingerprints connecting him to the scene, his confession to the crime, or affirmative testimony identifying him as the burglar, the evidence insufficiently identifies him as the September 11 burglar who entered his parents' house through the kitchen window. As the trial court noted, other circumstantial evidence sufficiently proved his identity. Alma and Clyde testified that defendant knew Alma kept a metal container of change in their bedroom, usually stored under the bed. Apart from the misplaced screen and knickknacks, the burglar disturbed nothing in Clyde and Alma's house except the missing money. These two facts allowed the court to conclude "it was an inside job." (Tr. Vol. II, 111.) Moreover, the burglary occurred amidst a series of burglaries and thefts defendant committed against Clyde and Alma. When taken as a whole and viewed in a light most favorable to the state, the evidence sufficiently proved defendant was the September 11 burglar.
 {¶ 32} Defendant lastly contends the evidence insufficiently proves a threat to inflict physical harm to support his September 24 aggravated burglary conviction. R.C. 2911.11(A)(1) defines aggravated burglary as a burglary in which the offender "inflicts, or attempts or threatens to inflict physical harm on another." The court found the evidence insufficiently proved defendant inflicted or attempted to inflict physical harm, but found defendant threatened to inflict physical harm. The court based its finding not on any threatening statement from defendant or on the victim's subjective perception of a threat, but on what it deemed to be an objective threat that the circumstances surrounding the burglary created. The trial court noted that defendant's forceful entry in the middle of the *Page 15 
night, his rapid ascent into Clyde and Alma's bedroom, and his highly excited and frenzied demeanor, would be threatening to any reasonable person beyond a reasonable doubt. Defendant, however, never expressly threatened the couple, and while a threat may be objectively implied from the totality of the circumstances, State v. Green, Belmont App. No. 05 BE 36, 2006-Ohio-7074, ¶ 38; In re Burton, 160 Ohio App.3d 750,2005-Ohio-2210, ¶ 7, defendant's statements, actions, and demeanor did have that purpose or effect.
 {¶ 33} Defendant's breaking through Clyde and Alma's back door and hastily running up their steps undoubtedly scared the couple, but alone such actions did not convey a threat of physical harm. Indeed, were a victim's fear alone enough to support a finding that a defendant threatened physical harm, virtually all burglaries would be aggravated burglaries. Cf. R.C. 2911.12(A)(1). Similarly, although defendant's plea for money, frenzied demeanor and excited tone of voice might be interpreted as a threat if conveyed by a complete stranger in the middle of the night, defendant's asking for money was a recurring question in his relationship with his parents that never resulted in violence or force. The totality of the circumstances and the history between the parties leaves the evidence insufficient to demonstrate defendant's demeanor was a threat to physically harm his parents.
 {¶ 34} The trial court, however, found defendant guilty both of aggravated burglary and the lesser-included offense of burglary for the events occurring on the night of September 24, and the court merged the convictions for the purpose of sentencing. Although the evidence is insufficient to sustain the verdict of aggravated burglary in violation of R.C. 2911.11(A)(1), it is sufficient to sustain a verdict on the lesser-included offense of burglary in violation of R.C. 2911.12(A)(1): defendant without privilege entered *Page 16 
Clyde and Alma's house, an occupied structure, by breaking through the back door with the purpose of stealing Clyde's dry cleaning business's bank bag. We thus reduce defendant's aggravated burglary conviction to a burglary conviction.
 {¶ 35} Accordingly, defendant's third assignment of error is sustained in part and overruled in part.
 {¶ 36} Because the sentence the trial court imposed for defendant's September 24 aggravated burglary runs concurrently with and for the same term as his September 11 burglary, September 13 burglary and September 24 robbery convictions, and because the sentence for his fifth-degree theft conviction runs concurrently with his other convictions, neither our modification of defendant's conviction for aggravated burglary to a conviction for burglary, nor our modification of defendant's theft conviction from a fifth-degree felony to a first-degree misdemeanor, requires resentencing.
 {¶ 37} Having overruled defendant's first and second assignments of error, but having sustained in part and overruled in part his third assignment of error, we affirm, as modified, the judgment of the trial court.
Judgment affirmed as modified.
 PETREE and KLATT, JJ., concur. *Page 1