[Cite as *State v. Osborn*, 2024-Ohio-528.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 22AP-695 |
| v. | : | (C.P.C. No. 19CR-1789) |
| Holli M. Osborn, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on February 13, 2024

**On brief:** *G. Gary Tyack,* Prosecuting Attorney, and *Sheryl L. Prichard*, for appellee. **Argued:** *Sheryl L. Prichard.*

**On brief:** *The Law Office of Donald Gallick LLC*, and *Donald Gallick*, for appellant. **Argued:** *Donald Gallick.*

APPEAL from the Franklin County Court of Common Pleas

BOGGS, J.

{¶ 1} Defendant-appellant, Holli M. Osborn,[1] appeals the judgment of the Franklin County Court of Common Pleas, which convicted her of murder, in violation of R.C. 2903.02, an unclassified felony, with a firearm specification. For the following reasons, we overrule Holli's assignments of error and affirm the trial court's judgment.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} On the morning of July 18, 2018, Dublin police responded to a 911 call which reported a deceased person at 5709 Ennishannon Drive in Dublin, Ohio. The officers arrived to find Dr. Chris Osborn face down in bed with an apparent gunshot wound to the head and two guns on the floor next to the bed. When the police arrived, Dr. Osborn's wife, Holli, was the only other person in their home.

---

[1] The defendant legally changed her name to Holli M. Cole during the trial court's proceedings.

{¶ 3}     The officers noted that Holli seemed impaired, and Officer Gwen Whittaker testified that Holli had indicated that she had been drinking and had taken some prescribed medications.  Officer Eric Walden testified that Holli looked "disheveled" and was in "sleep type clothing" and that he could detect some alcohol on her breath.  He also testified that her speech was slurred and that she struggled to keep her eyes open at times.  He reported that Holli had stated she had taken Valium, as prescribed for Lupus.  Officer Walden also testified that Holli made seemingly contradictory statements and that he needed to ask her questions multiple times to get a clear answer.  For example, he testified that Holli stated that she found it odd that her husband was still in bed but that he also occasionally slept later after working a longer shift.  She was also unsure whether her daughter from a previous relationship was at home.  *Id.*  Officer Walden testified that Holli said she woke up around 6:30 that morning, had gone to the home's garage to smoke cigarettes, and that when she came back inside her husband was still in bed.  When she went to check on Dr. Osborn, she saw blood and made several unsuccessful attempts to call 911.  She was ultimately able to call her father through Alexa, a voice service device, and he then in turn called 911.

{¶ 4}     That morning, after securing the scene, Dublin police transported Holli to the Dublin Justice Center as Holli was seemingly too intoxicated to drive.  They placed her in a room within a secure section of the police department and stationed a police officer outside the door.  She was able to sleep, and the police brought her a blanket, soup, water, and a change of clothes.  Around 10:15 a.m., a police officer asked Holli if she would consent to a gunshot residue ("GSR") test after officers observed that she was touching her face and other objects, which could destroy GSR evidence.  Holli consented to the GSR test, and Detective Jason Murphy took swab samples.

{¶ 5}     The police continued to give Holli time to rest as they were still concerned with her being coherent and comfortable enough to give a formal interview.  Around 2:50 p.m., the police began their formal interview with Holli wherein she was read her rights, confirmed she understood, signed a waiver, and provided coherent answers.  Around 5:22 p.m., Holli asked for an attorney, and the formal interview ended.

{¶ 6}     On April 12, 2019, Holli was indicted on two counts of murder with a firearm specification attached to each count.  On September 17, 2020, Holli filed a motion to

suppress the evidence from the GSR test as an unconstitutional search under the Fourth and Fourteenth Amendments to the United States Constitution and Article I, Section 14 of the Ohio Constitution.  On September 28, 2020, Holli filed a motion to suppress evidence and statements obtained during the Dublin Police Department's custodial interrogation, arguing that she was intoxicated and therefore was unable to knowingly, intelligently, and voluntarily waive her rights.

{¶ 7}   On March 8, 2021, the trial court conducted a hearing on Holli's motions to suppress. On July 12, 2021 the trial court denied Holli's motions.  The trial court found that probable cause existed at the time the GSR test was performed, that there were exigent circumstances to justify the warrantless search, and that the search was not unreasonable. (July 12, 2021 Decision & Entry at 7-8.) With respect to her custodial interrogation, the trial court found that Holli knowingly, intelligently, and voluntarily waived her *Miranda* rights and consented to the custodial interrogation.  *Id.* at 15.

{¶ 8}   On September 26, 2022, a jury trial commenced, and the prosecution called 15 witnesses over 9 days.  The jury heard from multiple neighbors, forensic experts, police officers and detectives, Bureau of Criminal Investigation ("BCI") agents, as well as from Lauren and Rachel Osborn, Dr. Osborn's daughters from his previous marriage.  Lauren testified that Dr. Osborn and Holli began dating in January or February of 2016, became engaged in April 2016, and married in September 2016.  Lauren also testified that after a honeymoon period, the marriage seemed more strained, with Dr. Osborn appearing more stressed and Holli increasing her alcohol consumption.  Rachel described the relationship between her father and Holli as a rollercoaster.

{¶ 9}   Lauren and Rachel both testified that they were with Dr. Osborn the night before he died.  Lauren noted that her father seemed very stressed and distraught.  Around 9:00 p.m., Holli came to the house, pointed at Dr. Osborn, and said that she needed to talk to him.  Lauren testified that Holli seemed angry.  Dr. Osborn and Holli went into their bedroom to talk for a few minutes and then told Lauren that they were going to go for a drive to talk.

{¶ 10} After their father left with Holli, Lauren and Rachel went on a walk in the neighborhood.  When they arrived back at the house, Dr. Osborn and Holli were still not back, so Lauren left around 9:45 p.m. and Rachel left shortly thereafter.  Lauren testified

that later that night Holli posted a message on social media that read, "If I die tomorrow, what would be the one thing you will always remember about me?"

{¶ 11} The trial court also heard testimony from Detective Jacob Williams who handled the digital forensics of the case. Detective Williams had completed downloads of Dr. Osborn and Holli's cell phones, including numerous text messages. The state introduced an extraction report of Holli's phone which consisted of a selection of approximately 500 text messages between Dr. Osborn and Holli. The state argued that those messages were relevant because they go to Holli's state of mind, leading up to the date of Dr. Osborn's death, and are relevant to show motive. Holli's counsel had objected in a motion in limine to admission of the selected text messages, arguing that the text messages extracted by the state were unfairly prejudicial, and that the state was introducing them solely to disparage Holli's character. He also argued that the text messages could be construed as evidence of inadmissible other "bad acts." (Sept. 26, 2022 Tr. at 44.) Her counsel also argued, however, that if any of the text messages were let in, then *all* of the couple's text messages should be admitted to show a "much more complete picture of what the relationship was." *Id.* at 36. Ultimately, the court allowed the 500 text messages offered by the state into evidence, and also granted Holli's counsel's request that the couple's remaining text messages also be submitted for the jury to review.

{¶ 12} The text messages from the six months prior to Dr. Osborn's death ranged from affectionate to argumentative. Detective Williams read texts during his testimony that catalogued the couple's arguments about her drinking too much, allegations of infidelity, and jealousy. There were also text messages in which Holli asked Dr. Osborn for passwords to his email and other online accounts and indicated that she was tracking his location as well as messages and calls on his phone. Detective Williams also read text messages in which Dr. Osborn expressed that they should not continue in their marriage. In the days leading up to his death, text messages between the couple showcased an argument that occurred after Dr. Osborn obtained the phone number of a bartender and that led Holli to leave the marital home.

{¶ 13} The trial court also heard testimony from BCI agents that the bullets taken from Dr. Osborn's body and mattress shared matching characteristics with one of the guns found on the floor next to the bed where Dr. Osborn was found. Another BCI agent testified

that the results of the GSR test done on Holli was positive, indicating that either she had fired a firearm, was standing in the vicinity of the firearm when it was fired, or that she touched something with GSR on it. There was also testimony from forensic experts and coroners that concluded that Dr. Osborn's death was homicide and not a suicide. They also concluded that the gun was fired from a close, intermediate range but was not in direct contact with Dr. Osborn. BCI Agent Nicole Augsback testified that Holli was matched as the single-source DNA profile on the gun that shared matching characteristics with the bullets that were taken from Dr. Osborn's body.

{¶ 14} After the state rested its case-in-chief, the defense moved for acquittal under Crim.R. 29. The trial court denied the motion, "finding that reasonable minds can reach different conclusions as to whether each element of a crime has been proven beyond a reasonable doubt." The defense renewed its Crim.R. 29 motion after the defense rested, having called no witnesses, and the trial court again denied the motion.

{¶ 15} On October 6, 2022, a jury returned a verdict finding Holli guilty of both counts of murder and both firearm specifications. On November 3, 2022, Holli was sentenced to 15 years to life with a mandatory, consecutive 36-month sentence for the firearm specification, for a cumulative prison sentence of 18 years to life.

{¶ 16} On November 15, 2022, Holli filed this appeal in which she raises five assignments of error, as follows:

> (1) The trial court erred by denying the motion to suppress appellant's involuntary statements because she was under the influence of drugs and/or alcohol at the time of her custodial interrogation.
>
> (2) The warrantless collection of evidence for a gunshot residue test violated the Fourth Amendment as the trial court erroneously found an exigent circumstance exception.
>
> (3) The trial court erred by allowing five hundred text messages into evidence, in violation of the Ohio Rules of Evidence which was plain error and also denied appellant of the constitutional right to a fair trial.
>
> (4) The conviction is not supported by sufficient evidence and appellant suffered a Sixth and Fourteenth Amendment deprivation because her trial attorneys failed to move for a judgment of acquittal.

(5) The conviction is against the manifest weight of the evidence because the physical evidence fails to prove her guilt beyond a reasonable doubt and because the evidence suggests the police failed to investigate other suspects who may have committed the homicide.

## II. ANALYSIS

### A. Assignment of Error No. 1

{¶ 17} Holli's first assignment of error argues the trial court erred in denying her motion to suppress statements made during her custodial interrogation, which she claims were involuntary. However, Holli does not direct this court to any place in the record where the state used any of her custodial statements at trial. It is not this court's duty to search the record for evidence to support an appellant's argument as to alleged error. *Hardy v. Belmont Corr. Inst.*, 10th Dist. No. 06AP-116, 2006-Ohio-3316, ¶ 10, citing *Sherman v. Sherman*, 10th Dist. No. 05AP-757, 2006-Ohio-2309, ¶ 15, and *State ex rel. Petro v. Gold*, 10th Dist. No. 04AP-863, 2006-Ohio-943, ¶ 94. This court may disregard arguments if the appellant fails to identify the relevant portions of the record upon which the errors are based. *Hardy* at ¶ 10, citing *In re C.C.*, 10th Dist. No. 04AP-883, 2005-Ohio-5163, ¶ 80; App.R. 12(A)(2). Because Holli does not point the court to any of her custodial statements that are in the record, or used by the state, we overrule Holli's first assignment of error. However, we will continue our analysis of the first assignment of error in order to reach the merits.

{¶ 18} In ruling on a motion to suppress, the trial court assumes the role of the trier of fact. *State v. Mills*, 62 Ohio St.3d 357, 366 (1992). On review, we accept the trial court's factual findings if they are supported by competent, credible evidence. *State v. Stokes*, 10th Dist. No. 07AP-960, 2008-Ohio-5222, ¶ 7. As the Supreme Court of Ohio has observed, "[a]ppellate review of a ruling on a motion to suppress presents a mixed question of law and fact. An appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. But the appellate court must decide the legal questions independently, without deference to the trial court's decision." *State v. Banks-Harvey*, 152 Ohio St.3d 368, 2018-Ohio-201, ¶ 14.

{¶ 19} It is well-settled that "[a] suspect in police custody ' "must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used

against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.' ' " *State v. Valentine*, 10th Dist. No. 14AP-893, 2016-Ohio-277, ¶ 10, quoting *State v. Lather*, 110 Ohio St.3d 270, 2006-Ohio-4477, ¶ 6-7, quoting *Miranda v. Arizona*, 384 U.S. 436, 479 (1966). A suspect may, however, "waive or relinquish a known right," and, "[i]n the context of *Miranda*, the United States Supreme Court has explained the two aspects of waiver." *Id.* First, "relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception," and "[s]econd, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.*

{¶ 20} Under Ohio law, "[a] court may infer from the totality of the circumstances that a defendant voluntarily, knowingly, and intelligently waived his rights." *Id.* at ¶ 11, citing *State v. Clark*, 38 Ohio St.3d 252, 261 (1988), and *State v. Gapen*, 104 Ohio St.3d 358, 2004-Ohio-6548, ¶ 52. A review of the totality of the circumstances "includes 'the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement.' " *Id.*, quoting *State v. Dixon*, 101 Ohio St.3d 328, 2004-Ohio-1585, ¶ 25. Further, " '[o]nly if the "totality of the circumstances surrounding the interrogation" reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.' " *Id.*, quoting *Lather* at ¶ 7, quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986).

{¶ 21} Here the trial court found, and the parties no longer dispute, that Holli's interview with the Dublin police was a custodial interview. In its decision and entry denying Holli's motion to suppress statements made during her custodial interrogation, the trial court found that Holli knowingly, intelligently, and voluntarily waived her *Miranda* rights. (July 12, 2021 Decision & Entry at 15.) While Holli had appeared under the influence of drugs and alcohol when police first arrived at her home, the trial court heard testimony at the suppression hearing from Dublin police officers that over time she became more coherent, and her speech improved. The trial court noted that Holli had been at the police station for almost six hours before the police began the custodial interview and that when

the interrogation began, Holli was able to answer questions, appeared coherent, and was not unsteady on her feet. The trial court also heard testimony that the police had provided water and food to Holli while she waited and that she was given time to sleep and sober up. We find that under the totality of the circumstances that Holli knowingly and voluntarily waived her *Miranda* rights. We therefore overrule Holli's first assignment of error.

## B. Assignment of Error No. 2

{¶ 22} In Holli's second assignment of error, she contends that the collection of samples for the GSR test without a warrant was a violation of her Fourth Amendment rights and that the trial court therefore erred in denying her motion to suppress the GSR test results. We do not agree.

{¶ 23} "The Fourth Amendment to the United States Constitution, and Section 14, Article I of the Ohio Constitution, prohibit unreasonable searches and seizures." *Dayton v. Erickson*, 76 Ohio St.3d 3, 11 (1996). " '[W]arrantless searches are, per se, unreasonable, unless they fall within one of the established exceptions' " to the warrant requirement. *State v. Pi Kappa Alpha Fraternity*, 23 Ohio St.3d 141, 143-44 (1986), quoting *Katz v. United States*, 389 U.S. 347 (1967). In denying Holli's motion to suppress, the trial court looked to *Cupp v. Murphy*, 412 U.S. 291 (1973), which held that a warrant is not required when a search preserves highly evanescent evidence and there is minimal intrusion imposed upon the defendant. In *State v. Jarrell*, 10th Dist. No. 96APA03-357, 1996 Ohio App. LEXIS 5767 (Dec. 17, 1996), this court found there was no Fourth Amendment violation when police conducted a GSR test without a warrant where there was probable cause.

> The technique involved in obtaining a gun residue sample, *i.e.*, the swabbing of hands, cannot be said to be more intrusive than the extraction of blood involved in *Schmerber* [*v. California*, 384 U.S. 757 (1966)] or even the scraping of fingernails in *Cupp*. Moreover, as noted by the court in [*State v.*] *Howell* [524 S.W.2d 11 (Mo.1975)], the material sought by the test is capable of dissipating or being destroyed in a short amount of time, thus justifying a warrantless search to preserve "highly evanescent evidence." *Cupp*, *supra*.

*Jarrell* at *26.

{¶ 24} Here, Holli argues that these circumstances are distinguishable from *Jarrell*, where the police had a plain view of dried blood under the suspect's fingernails, establishing probable cause for the search. However, probable cause existed here as well. When police

officers arrived at the scene, Holli was the only person in the home with Dr. Osborn's body. The police found guns on the floor in the couple's bedroom, which was protected by a keypad lock outside the master bedroom door. As in *Jarrell*, the GSR evidence was highly evanescent evidence that was susceptible to destruction from simple activities like wiping one's hands or touching one's face or other objects. Police officers observed Holli touching her face and the table and drinking water—all of which could destroy the potential evidence necessary for a GSR test. Here, the samples for the GSR test were taken with minimal intrusion on Holli by running a swab along her hands and eyebrows. We find that the collection of samples for the GSR test does not run afoul of the Fourth Amendment as it involved the collection of highly evanescent evidence, taken with minimal intrusion on Holli, and was supported by probable cause. We therefore overrule Holli's second assignment of error.

### C. Assignment of Error No. 3

{¶ 25} In her third assignment of error, Holli asserts that the trial court committed plain error in allowing the state to introduce 500 text messages between Dr. Osborn and Holli into evidence.[2] Absent an abuse of discretion, we will not overturn a trial court's determination on the admissibility of evidence. *State v. Oteng*, 10th Dist. No. 14AP-466, 2015-Ohio-1231, ¶ 31, citing *State v. Jewett*, 10th Dist. No. 11AP-1028, 2013-Ohio-1246, ¶ 52, citing *State v. Martin*, 19 Ohio St.3d 122, 129 (1985); *State v. Ollison*, 10th Dist. No. 16AP-95, 2016-Ohio-8269, ¶ 46, citing *State v. Farrah*, 10th Dist. No. 01AP-968, 2002-Ohio-1918. However, whether other-acts evidence is admissible pursuant to Evid.R. 404(B) is a question of law that we review de novo. *State v. Hartman*, 161 Ohio St.3d 214, 2020-Ohio-4440, ¶ 22. If other-acts evidence is admissible for permissible purposes under Evid.R. 404(B), a trial court then has discretion whether to allow the other-acts evidence. *Id.*, citing *State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, ¶ 17.

{¶ 26} Evid.R. 404(B)(1) and (2) state:

> (1) Evidence of any other crime, wrong or act is not admissible
> to prove the person's character in order to show that on a

---

[2] While Holli has argued this assignment of error under a plain error standard, we note that her counsel did object to the admission of the text messages between Dr. Osborn and Holli. Therefore, we conduct our review under an abuse of discretion standard.

particular occasion the person acted in accordance with the character.

(2) This evidence may, be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identify, absence of mistake, or lack of accident.

**{¶ 27}** The Supreme Court of Ohio has noted:

Evid.R. 404(B) categorically prohibits evidence of a defendant's other acts when its only value is to show that the defendant has the character or propensity to commit a crime. Other-acts evidence may, however, be admissible for another non-character-based purpose, such as "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id.* "The key is that the evidence must prove something other than the defendant's disposition to commit certain acts."

*State v. Smith*, 162 Ohio St.3d 353, 2020-Ohio-4441, ¶ 36, quoting *Hartman* at ¶ 22.

**{¶ 28}** Here, Holli argues that the text messages' only value was to disparage her character, while the state contends that the text messages were admissible to prove Holli's intent, motive, and state of mind under Evid.R. 404(B). We agree with the state. The text messages show a volatile history of jealousy and infidelity, offering a potential motive for Holli. The text messages also show Holli's state of mind in the days leading up to Dr. Osborn's death. The couple argued via text message about Dr. Osborn's interactions with other women, a specific instance of infidelity on the part of Dr. Osborn, and Dr. Osborn obtaining the phone number of a bartender just days prior to his death.

**{¶ 29}** Within this assignment of error, Holli also argues that counsel's failure to timely object to the admission of certain text messages constitutes ineffective assistance of counsel under the Sixth Amendment, resulting in a deprivation of her constitutional right to a fair trial under the Fifth and Fourteen Amendments. To establish ineffective assistance of counsel, Holli must show that counsel's performance was deficient, and that counsel's deficient performance prejudiced her. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Under *Strickland*, appellate courts examine counsel's performance under a highly deferential standard, making every effort to "eliminate the distorting effects of hindsight." *Id.* at 689.

{¶ 30} Holli now argues that her counsel was ineffective by not individually objecting again to some text messages she argues are prejudicial and inadmissible. We note the Supreme Court has found that "failure to make objections does not constitute ineffective assistance of counsel *per se*, as that failure may be justified as a tactical decision." *State v. Gumm*, 73 Ohio St.3d 413, 428 (1995). We note that Holli's counsel *did* object to the admission of the 500 text messages between Dr. Osborn and Holli that the state sought to admit. But Holli's counsel also made a strategic choice to argue that if the trial court did admit some of the text messages, it should admit all of the couple's text messages, including those that showed an affectionate relationship between Dr. Osborn and Holli. We conclude that Holli's counsel's performance fell within the wide range of reasonable professional behavior expected of attorneys.

{¶ 31} For these reasons, we overrule Holli's third assignment of error.

**D. Assignments of Error No. 4 and 5**

{¶ 32} We now consider Holli's fourth and fifth assignments of error, regarding the sufficiency and the manifest weight of the evidence, respectively, in supporting Holli's conviction. Sufficiency and manifest weight of the evidence are distinct legal concepts. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). A finding that a conviction is supported by the manifest weight of the evidence, however, necessarily includes a finding that the conviction is supported by sufficient evidence and will therefore be dispositive of the issues of sufficiency of the evidence. *State v. McCrary*, 10th Dist. No. 10AP-881, 2011-Ohio-3161, ¶ 11. We therefore first consider whether Holli's conviction is supported by the manifest weight of the evidence.

{¶ 33} With respect to the weight of evidence, the Supreme Court has explained:

> Weight of the evidence concerns "the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the *greater amount of credible evidence* sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its *effect in inducing belief*."

(Emphasis sic.) *Thompkins* at 387, quoting *Black's Law Dictionary* 1594 (6th Ed.1990).  A challenge to the manifest weight of the evidence presents a question of persuasion.  *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 19.

**{¶ 34}** Here, Holli argues that the evidence supporting her conviction was scant because forensic witnesses could not conclusively confirm which firearm fired the bullets that caused Dr. Osborn's death and that forensic experts could not definitively say that Holli fired the gun that killed Dr. Osborn.  She also argues that the Dublin police failed to fully investigate other potential leads including unexplained indentations in the grass outside Dr. Osborn and Holli's home, a $2 million life insurance policy to Dr. Osborn's ex-wife, and four people entering the home after the homicide and potentially removing items.

**{¶ 35}** We are not persuaded by Holli's manifest weight arguments.  When reviewing a challenge to the manifest weight of the evidence, an appellate court " 'review[s] the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).  A reversal on manifest weight grounds is warranted only in " 'exceptional case[s] in which the evidence weighs heavily against conviction.' " *Thompkins* at 387, quoting *Martin* at 175.

**{¶ 36}** We do not find a reversal warranted here.  During a lengthy trial, the jury heard testimony from a variety of experts and witnesses.  The jury also reviewed hundreds of text messages that show a volatile relationship between Dr. Osborn and Holli.  Witnesses testified that they had argued in the days leading up to his death and that the couple was approaching separation after Dr. Osborn obtained the phone number of a bartender.  Forensic experts also analyzed the two handguns that were found next to Dr. Osborn's body, one of which contained only Holli's DNA and shared matching characteristics with the three bullets that struck Dr. Osborn.  Holli was also found to have GSR on her hands and eyebrows, meaning she either was near a gun when it was fired, touched something that had GSR on it, or fired a gun.  She was also the only person inside the home when police answered the 911 call.  All this considered, we do not see the evidence weighing heavily

against the conviction and we cannot conclude that the jury clearly lost its way in returning a guilty verdict.

{¶ 37} Because we have found that Holli's conviction was not against the manifest weight of the evidence, we decline to separately address her sufficiency of the evidence argument.[3] Accordingly, we overrule Holli's fourth and fifth assignments of error.

## III. CONCLUSION

{¶ 38} Having overruled Holli's five assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

LUPER SCHUSTER and LELAND, JJ., concur.

---

[3] In her fourth assignment of error, Holli also claims that her trial counsel failed to make a Crim.R. 29 motion for acquittal. Our review of the record, however, indicates that her counsel twice moved for acquittal following the prosecution's case-in-chief.